## WINTER v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. April 12, 1926.)

No. 7024.

1. Automobiles ⬳355—Conviction of knowingly receiving stolen automobile, transported in interstate commerce, held warranted (National Motor Vehicle Theft Act, § 4 [Comp. St. Ann. Supp. 1923, § 10418e]).

Evidence *held* to warrant conviction of knowingly receiving a stolen automobile, transported in interstate commerce, in violation of National Motor Vehicle Theft Act, § 4 (Comp. St. Ann. Supp. 1923, § 10418e).

2. Criminal law ⬳806(3)—Refusal of instruction that defendant's knowledge that automobile received by him was stolen was separate substantive fact, to be proved beyond reasonable doubt, held not error, in view of instruction on reasonable doubt, correctly defining all essential elements of offense.

In trial for receiving stolen automobile, refusal of instruction that defendant's alleged knowledge that car was stolen was separate substantive fact, to be established to jury's satisfaction beyond reasonable doubt, *held* not error, where court clearly and correctly defined all essential elements of offense, and instructed jury that it must be satisfied of truth of charges beyond all reasonable doubt; it being unnecessary to separate, distinguish, and emphasize each element of offense.

3. Criminal law ⬳763, 764(6), 829(12)—Refusal of instruction to acquit if defendant gave reasonable, natural and probably true explanation of incriminating facts, unless government proved explanation false beyond reasonable doubt, held not error, in view of instruction as to reconciling testimony and impropriety of court indicating truth of any testimony.

In trial for receiving stolen automobile, refusal of instruction to acquit if defendant gave reasonable, natural, and probably true explanation of incriminating facts and circumstances, unless government proved explanation false beyond reasonable doubt, *held* not error, in view of instruction as to reconciling conflicting statements, and that on whole testimony, defendant must be found guilty, if at all, beyond reasonable doubt; it being unnecessary and improper for court to indicate that any particular part of testimony is reasonable, natural, and probably true.

**4. Criminal law ⚖➞829(1).**

No error can be predicated on refusal of request for instructions sufficiently covered by court's charge.

**5. Criminal law ⚖➞829(10)—Refusal of instruction that accomplice's testimony should be received with suspicion and greatest caution held not error, in view of instruction given.**

Refusal of instruction that accomplice's testimony should be received with suspicion, and very greatest care and caution, *held* not error, in view of instruction to receive such testimony with great caution, and require corroborating testimony before giving credence to it.

**6. Criminal law ⚖➞763, 764(6)—Instruction that establishment of accused's reputation for good character could alone create reasonable doubt held properly refused, as indicating weight such evidence should have, and instruction that such evidence should be considered on question of reasonable doubt being sufficient.**

Instruction that establishment of accused's reputation for good character could alone create reasonable doubt, though without it other evidence of guilt would be convincing, *held* properly refused, as conveying impression that good character was entitled to such weight as to raise reasonable doubt of guilt; court's instruction that such evidence should be received and considered, in connection with all evidence, as bearing on question of reasonable doubt, being sufficient.

In Error to the District Court of the United States for the District of South Dakota; James D. Elliott, Judge.

Karl E. Winter was convicted of knowingly receiving, ·concealing, and storing a stolen automobile, transported in interstate commerce, and he brings error. Affirmed.

Philip E. Winter, of Casper, Wyo., and William G. Rice, of Deadwood, S. D. (Joseph S. Wishart, of Deadwood, S. D., on the brief), for plaintiff in error.

E. D. Barron, Asst. U. S. Atty., of Sioux Falls, S. D. (S. W. Clark, U. S. Atty., of Redfield, S. D., and P. J. Tscharner, Asst. U. S. Atty., of Rapid City, S. D., on the brief), for the United States.

Before KENYON and VAN VALKENBURGH, Circuit Judges, and YOUMANS, District Judge.

VAN VALKENBURGH, Circuit Judge. Plaintiff in error was indicted in the District Court of the United States for the District of South Dakota, charged with a violation of section 4 of the Act of October 29, 1919, commonly known as the National Motor Vehicle Theft Act (Comp. St. Ann. Supp. 1923, § 10418e). The indictment was in two counts. The first count charged the defendant with knowingly, unlawfully, and feloniously receiving into his possession, and concealing and storing, a certain Cadillac touring automobile. The second count, in like manner, charged the same offense with respect to a Buick five-passenger touring automobile; both said vehicles having been transported in interstate commerce from Sioux City, in the state of Iowa, into the state of South Dakota. The trial resulted in° conviction upon the first count, and acquittal upon the second count.

[1] The record discloses that plaintiff in error, who had formerly lived at Rapid City, S. D., and had been in the employ of the United States Gypsum Company, running a plaster mill near Rapid City, was in 1921 occupied in building such a mill for a company consisting of Rapid City men, which had its plant at Black Hawk in said state. He was living at that time on a ranch at Buffalo Gap, but in constant communication with Black Hawk and Rapid City by reason of his employment. Prior to this time he testifies that he had done a general trading business, buying and selling sheep, cattle, hogs, and anything that he could do; this included trading in secondhand automobiles. Among his associates and acquaintances at Rapid City were one William Dilger, a real estate dealer, Julius Linde, a banker, and George McCoy, a garage man. Another intimate was one Harry Brainard, a banker at Fairburn, S. D.

At this time in 1921 one Clarence Bordwell, of Denver, Colo., and one Dell Willis of Sioux City, Iowa, were engaged in stealing automobiles in Sioux City, Iowa, and, it would seem, Minneapolis, Minn., and in other states, and in transporting them in interstate commerce into the state of South Dakota for disposition and sale. All of these parties, with the exception of Brainard, had been convicted for conspiring to violate the same act. The acquaintance of plaintiff in error with Bordwell and Willis began in the fall of 1921, some weeks before the offense charged in the indictment, which is laid at November 15th. At this first meeting plaintiff in error exchanged what is described as his "1919 Buick" for a 1920 Buick, known as the "Mission Hill car," which had been stolen by Bordwell and Willis. In addition to turning his car over to Bordwell and Willis, Winter paid to them the sum of $300. The transaction was closed in the office of Dilger, where arrangements were made for the bringing in of other cars for disposition in and about Rapid City and

Fairburn, S. D. Both Dilger and Winter at that time said they could take all the cars Bordwell and Willis could bring. Winter, while denying that he knew the cars were to be stolen cars, makes the following significant statement:

"Mr. Bordwell told me he could get secondhand cars from Sioux Falls, Minneapolis, Sioux City, cheap enough so we could make some money, and I was willing to take the statement of a man I knew to be a bootlegger that he was coming up with secondhand cars to be sold."

In another part of his testimony he says he understood the cars to be "spotted" cars; that is to say, cars that had been used in bootlegging. Dilger testifies that at this meeting in Dilger's office, where the trade for the Mission Hill car was consummated, Winter told Willis he would have to change the numbers on the car. Willis corroborates this, and testifies that he did change the numbers, and so reported to Winter. Later on the witness Hanni, a special agent of the Bureau of Investigation, found that the Mission Hill car, acquired by Winter in his trade, had on it the same engine number and the same serial number of the 1919 Buick which Winter had originally owned and traded for the Mission Hill car. Winter testifies that he knew some numbers were to be changed, but he supposed they were the license numbers. Meantime, Dilger testifies that he informed Winter expressly that the Mission Hill car was a stolen car.

The next transaction between these parties occurred about two weeks later. Concerning this Willis testifies as follows:

"A couple of weeks after this, Bordwell and I stole a car, and brought it to Rapid City. After Dilger went out and got Winter into Dilger's office, I had a conversation there with Winter in the presence of Dilger. Both of them seemed to think I could dispose of the car to a man by the name of Brainard at Fairburn. I took it to Fairburn and sold it.

"Q. You took it over? A. Winter and I." At Fairburn, Winter got Brainard. "I told Brainard that I wanted to sell that car. I never had seen Brainard before. We agreed on the price of $525. Brainard went and got the money somewhere and paid it to me personally.

"Q. Did you know what business he was in down there? A. I believe he had a garage and an interest in one of the banks. The defendant and I drove back to Rapid City, where I stayed at Dilger's all night. I believe that Winter stayed there, too, but I

could not say for sure. Dilger and Winter said they could take all the cars we could bring."

In his direct testimony Winter said:

"I did not have any knowledge of any dealings between Harry Brainard and these men. I did not introduce them to Brainard or in any way bring the parties together."

On cross-examination he testified as follows:

"I did not go down to Fairburn with Willis in that Scotland car. I did go down in my own car. Willis did go down in that car. I imagine he did sell it to Brainard. I was not there when that car was sold.

"Q. What did you go down there for? A. I told him I would show him where Brainard lived. I did not go down there for the purpose of promoting or effecting the sale. I did tell Mr. Brainard about the car. Mr. Brainard had told me he wanted a car, and I was looking for a car for him. * * * I introduced Brainard to Willis. I did not tell him who Willard was, and I did not know Willis' name. I just told him this was the man I had talked to him about, and I told Brainard to go ahead and make the deal."

Willis testifies that within a very few minutes after he met Winter and Brainard he told each that he had a stolen car to sell, and sold it to Brainard.

We come now to the transaction upon which the indictment is based. Some time in November Bordwell stole the Cadillac car described in the first count of the indictment in Sioux City, Iowa; also the Buick car known as the "Jensen car," in the same city. The Cadillac car sustained an injury to a wheel at St. Charles, S. D. Bordwell returned to Sioux City by train, made arrangements for a new wheel, and procured one Ray Hebard, a garage mechanic, to go with him to make the repairs. Hebard had no knowledge that the cars were stolen. After the repairs were made, Bordwell and his party proceeded to Fairburn, S. D. There he asked Harry Brainard to call up plaintiff in error. The next morning, pursuant to this call, plaintiff in error came out to a shack near Fairburn; what then transpired, from the standpoint of the government, is best described in the language of the witness Bordwell:

"Brainard knew where we were going. I had no understanding with Brainard that we were to go to the shack. I had no understanding with the defendant that we were to go to the shack. Brainard told him. I had told Brainard. We took out the Cadillac and Buick. It was three or four miles from

Fairburn. I stayed there that night. Next morning I told the defendant I had two cars, a Cadillac with one bum tire. He said he would get a tire somewhere during the day. He came out again that evening, and he had arranged for a tire. He said Linde would take the Cadillac, and he thought Linde would furnish the money for both of them, and to come into Fairburn that night. We got into Fairburn with both cars just after dark, left the Buick in the street at Fairburn, and went out a little north of Fairburn, and waited for the defendant with the tire. He had told me to leave the Buick in the street at Fairburn. We took off the old rim and old tire, and the defendant came out with the tire in a half hour or so, out where we had the Cadillac jacked up. We put on the tire, and defendant and I drove the Cadillac car to Rapid City, I driving, and he went and got Julius Linde. The defendant had me park the Cadillac car at the east side of the Harney Hotel. I waited there until Julius Linde and the defendant came—just a few minutes after the defendant left. He just said Linde wanted to try the car out. On the way from Fairburn to Rapid City, I had told the defendant that both cars came from Sioux City, and were stolen cars. They came back and said Linde wanted to wash up the Cadillac car and see what it looked like. I said all right. I went to the Harney Hotel. The defendant came there an hour or two hours later; said Linde would pay for the car after it was washed up, after he had looked it over. Winter stayed at Harney Hotel that night and occupied the same room with me. * * * The second evening the defendant merely carried upstairs in a room at the hotel $1,400 and said that Linde had furnished that much for both cars. That was all he would give. * * * At that time I did nothing with reference to this Buick car. Must have been a week or two afterwards I was indicted over that Buick car and I came out to find it. I met the defendant (Winter) in Hot Springs. He said it had been taken out on a ranch thirty-five or forty miles somewhere northeast of Fairburn, and somebody had stolen it. I found it the first time on the 4th of July at Custer, S. D. It had been repainted green. * * * The defendant had previously told me to have Brainard call him up and he would be able to get hold of him. The money was paid to me in the Harney Hotel in currency. I did not give the defendant any of the money. I think Dell Willis and I had both told the defendant that we could get cars if he had a place to sell them. It was understood they

were stolen cars. The defendant knew the first car that he got at Black Hawk, the first time I ever met him, was stole."

On cross-examination, after detailing the circumstances of the earlier sale of the Mission Hill car to Winter, the witness said:

"I next saw Winter the next time I came up to that country, when we came up with the Buick car from Scotland, S. D. As to when we did in fact get to Fairburn with the Cadillac, that was in November before Thanksgiving. I did not see Winter then. I went and got hold of Harry Brainard, and he called up Winter, and I went out east of town to the little shack. He came out to the shack next morning. We started to Rapid City the next evening in the Cadillac car. We left the shack right after dark. Karl Winter drove out to the shack in the car; left it standing down on the road. I saw a car standing there that I took to be his. He went back to Fairburn ahead of us. Said he was going after a tire. The boys went to Rapid City in Karl Winter's car. * * * At Fairburn Harry Brainard came out with the defendant to that shack. The two cars were driven back to Fairburn the next evening. I drove the Cadillac and Eddie Larson drove the Buick. We drove, I should judge, a mile before we began fixing the tire, with me Eddie Larson and Ray Hebard. The defendant drove up with the tire for the Cadillac, right rear wheel."

Ray Hebard, the mechanic who accompanied Bordwell from Sioux City, testified that he had only became acquainted with Bordwell in November, 1921, at the time Bordwell hired him to fix this Cadillac which he had up in the country near St. Charles, S. D. Bordwell brought the Buick car there with the Cadillac wheel for the repair. Leaving there Bordwell drove the Cadillac and Larson drove the Buick; they drove out about three miles east of Fairburn to a shack and stayed all night. In the morning Winter came. He had some conversation with Bordwell and then went to town again. The witness thus continues:

"Next evening, I guess it was, he came out and told us to drive the cars into Fairburn. Said to drive the Buick, and leave it in town on the street. We drove to the village, and left the car some place on the street, got into the Cadillac, got to the edge of town, and had a flat tire. We had the flat tire at the shack before we left. The defendant brought a tire out, and we put the tire on, so we got in the Buick, and he and Bordwell got in the Cadillac and went to Rapid City. We left the Buick there in the

street. They went in the Cadillac some place and we went into the Harney Hotel. * * *

"I drove in this Buick car from St. Charles to Fairburn, and then left that car on the streets of Fairburn. Yes, sir; you understand me to say the defendant told me to leave it there on the street, and then I got in his car at Fairburn and drove it to Rapid City."

What became of this Buick car between this time and the time Bordwell says he recovered it later on, after he had been indicted, does not clearly appear from the record, except there is testimony to the effect that it found its way at one time into the hands of Brainard.

The defendant denied that he met these parties at the shack, and that he furnished repairs to the Cadillac at Fairburn. He admits that he rode from Fairburn to Rapid City with Bordwell in the Cadillac car, and that there was some trouble with a tire. He further admits that they parked by the Harney Hotel in Rapid City, as stated by Bordwell, and that he brought Linde to the car; that it was driven away as stated by Bordwell; that later he brought to Bordwell the money for the car, but claims the amount paid was $900, instead of $1,400. He further claims that he received no money in any of these transactions, had no personal interest in the matter, and that he acted solely for Linde. The testimony in this case involves a multitude of detail respecting the several transactions to which reference has been made. Enough has been set out in this statement to disclose the circumstances upon which the government relies to sustain the conviction. It is conceded that the car was stolen, and was transported in interstate commerce, and there is substantial evidence to the effect that the defendant Winter knew these essential facts. If so, and he participated actively in causing this to be done, and received the property within the meaning of the statute as charged, he was guilty of an offense. We think the evidence further sufficiently shows that he did receive this car, and that the same was under his direction and control from the time he joined the party at Fairburn. He directed the disposition of both cars from that time on. The receiving was actual, as well as constructive, even though he were acting, as he claims, merely as the agent for Linde. It was unnecessary that he personally should have been at the wheel on the trip from Fairburn to Rapid City. He, in effect, took the car from Bordwell, delivered it to Linde, and made the payment for it.

[2] We come, then, to the errors alleged to have been committed in the course of the trial. The following instruction was requested and refused: "The jury are instructed that the defendant's alleged knowledge that the car was a stolen car is a separate substantive fact, to be established, like any other fact in the case, to the satisfaction of the jury beyond a reasonable doubt." The court clearly and correctly defined all the essential elements of the offense, and instructed the jury that it must be satisfied, beyond all reasonable doubt, of the truth of the charges against him. This is sufficient. It is unnecessary in a charge to separate, distinguish, and emphasize each element of the offense.

[3] This further instruction was asked: "The jury are instructed that if, as to any incriminating facts and circumstances, the defendant gave an explanation that was reasonable, natural, and probably true, the jury should not convict him, unless the government proved such explanation false beyond a reasonable doubt." The jury was told that the evidence on some points was conflicting and that it was its duty to reconcile such conflicting statements, if possible; that if, after a fair and full consideration in the light of the other testimony in the case and other facts and circumstances, it found this to be impossible, then it was incumbent upon the jury to say where the truth lay. It is unnecessary, and in fact improper, for the court to select any part of the testimony, and in effect indicate that it is reasonable, natural and probably true. The case was submitted to the jury under directions that, upon the whole testimony, the defendant must be found guilty, if at all, beyond a reasonable doubt.

The Court of Appeals for the District of Columbia points out the vice in an instruction of this character. It says: "In a prosecution for receiving stolen goods, in which the instructions covered the question of presumption of innocence, a requested prayer that, 'if the defendants gave an explanation that was reasonable, natural, and probably true, the jury should not convict them, unless the government proves such explanation false beyond a reasonable doubt' held to have a tendency to confuse the jury." * * * In a prosecution for receiving stolen goods, a verdict of guilty necessarily amounts to a rejection of defendant's explanation." And further: "The jury had been correctly instructed that the burden was upon the government to establish every essential element

of the crime charged, and further that 'all the evidence in the case' was to be considered in the determination of that issue. That was sufficient." Baer v. United States, 54 App. D. C. 24, 293 F. 843.

In view of the court's charge, there was no error in the refusal of this request.

[4, 5] The following instruction was also requested: "The jury are instructed that the testimony of an alleged accomplice ought to be received with suspicion, and with the very greatest care and caution." To the refusal of that instruction, and the charge of the court on the same matter, exceptions were preserved. Of course, no error can be predicated upon the refusal of a request for instructions provided the court in its charge sufficiently covers the matter requested.

With respect to the testimony of accomplices the court said: "You are advised that the testimony of any accomplice should be received with great caution, and a juror should not place too much reliance upon the testimony of accomplices, but should require corroborating testimony before giving credence to such evidence. You will consider the position in which these witnesses, accomplices of this defendant under their own statements, stand in this light. But notwithstanding the great care with which testimony of an accomplice is to be received, you are instructed it is still true they are made by law competent witnesses. The law does not declare they shall not testify. On the contrary, the law permits them to testify, and it is for you to say, gentlemen, after taking into consideration the testimony of these various witnesses, all of the testimony in the case, together with that of the defendant, considering it all together, you are satisfied beyond all reasonable doubt that the charge or charges against the defendant in the indictment are proven. If you are so satisfied, it is your duty to convict the defendant. If you are not so satisfied, it is your duty to acquit him." This charge was unobjectionable, and submitted all upon this point to which the defendant was entitled. United States v. Richards (D. C.) 149 F. 443–454.

[6] In this case the testimony of these accomplices was corroborated in many substantial particulars. Finally, the defendant requested an instruction upon character in the following language: "The jury are instructed that the establishment of a reputation for good character by the accused could alone create a reasonable doubt in the minds of the jury, although without it the other evidence would be convincing." This instruction was refused, and to that refusal, and the

instruction given by the court in its charge, exceptions were preserved. Upon this point the court said:

"Some testimony has been introduced in this case with reference to good character, and you are advised that evidence of good character, if you find it proven in this case, is evidence in favor of the defendant possessing it. It goes to augment the presumption of innocence which the law raises in behalf of the defendant, and it must be manifest to you, to the ordinary man, that the man who, while presumed to be innocent, and therefore presumed to have an ordinarily good character, strengthens that character by the testimony of persons residing in the vicinity in which he lives, produces such evidence as would tend to strengthen that presumption of his innocence, just as, if he had undertaken to produce such evidence, and had failed, in other words, if his witnesses had proven him a bad character, it would tend to detract from that presumption of innocence which the law indulges in favor of every defendant, and so, to that extent, it is proper and competent evidence, and is to be considered by the jury along with the other evidence in the case, other facts and circumstances, as you find them. The law assumes that one who has established by his conduct in the community in which he resides a good character for honesty and as a law-abiding citizen is less liable to commit the offense charged than one who had not by his conduct, by his life, established such a reputation. You are advised that good character is competent testimony, and that you shall take it and consider it, and give it just such weight as appeals to your best judgment under your oaths as jurors, and when considered in connection with all of the testimony in the case, if you are not then satisfied beyond all reasonable doubt of the truth of the charge or charges against him, it is your duty to acquit him. If however, taking evidence of good character, and considering it, with all of the evidence in the case, you are then satisfied beyond all reasonable doubt of the truth of the charge or charges against the defendant, it would be your duty to return a verdict of guilty as charged in the indictment."

The plaintiff in error insists that he was entitled to the instruction requested, especially to the effect that the establishment of a reputation for good character could alone create a reasonable doubt in the minds of the jury. He relies principally upon the language of the Supreme Court in Edgington v. United States, 164 U. S. 361, 17 S.

Ct. 72, 41 L. Ed. 467. That case does not go so far as he contends. The Supreme Court had before it an instruction to the effect that evidence of good character could only be considered if the rest of the evidence created a doubt of defendant's guilt. The Supreme Court, in disapproval of that instruction, said: "The circumstances may be such that an established reputation for good character, if it is relevant to the issue, would alone create a reasonable doubt, although without it the other evidence would be convincing."

But that falls far short of declaring that a defendant is entitled to an instruction substantially in those words. On the contrary, further on in its opinion, the court said: "If the court had told the jury that his good character should be taken into consideration by them, and was entitled to much weight, a reasonable doubt of the prisoner's guilt might have been raised which would have resulted in his acquittal." The charge of the court just quoted does place this character evidence before the jury in that light.

A similar instruction was requested in Allen v. United States (C. C. A. Seventh Circuit) 4 F.(2d) 688. The court said: "The decision in Edgington v. United States, 164 U. S. 361, 17 S. Ct. 72, 41 L. Ed. 467, does not support such instruction. There the only question arose over a charge that limited the effect of character testimony to cases where great doubt existed. The vice of the language in the proposed instruction lies in the fact that it gives undue prominence to evidence which in some cases is unwarranted, and erroneously conveys to the jury the impression that such character witnesses have favorably impressed the court, when such may not have been the case."

Rowe v. United States (C. C. A. Eighth Circuit) 97 F. 779, 38 C. C. A. 496, merely holds, as did the Supreme Court in the Edgington Case, that:

"Evidence of the good character of a defendant is to be considered by the jury in all cases, in connection with all the other evidence, in determining his guilt or innocence of the crime with which he is charged, and an instruction that such evidence can only be considered in case the other evidence leaves the question of guilt or innocence in doubt is erroneous."

To the same effect is Humes v. United States, 182 F. 485, 105 C. C. A. 158. The jurors were told that this evidence of good character should be received and considered by them, in connection with all the evidence

in the case, as bearing upon the question of reasonable doubt. This was sufficient, and this exception to the charge, as well as to the action of the court in refusing to give the instruction requested, is without merit.

We have carefully considered all the specifications of error presented and find nothing which would lead to a reversal of this judgment. It is therefore affirmed.