## NEW YORK CENTRAL AND HUDSON RIVER RAILROAD COMPANY *v.* UNITED STATES (NO. 2).

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF 'NEW YORK.

.No. 69. Argued December 14, 15, 16, 1908.—Decided February 23, 1909.

*New York Central R. R. Co.* v. *United States, ante,* p. 481, followed as to constitutionality of the Elkins act of February 19, 1903, c. 708, 32 Stat. 847, and as to when offenses of giving rebates in violation of the Interstate Commerce act are complete.

The Elkins act applies to rebates paid after it went into effect although paid in pursuance of an agreement, and on shipments, made prior to that date; the agreement being illegal when made.

An indictment which definitely sets forth the elements of the offense of which it was intended to charge the accused is sufficient; and in this court only substantial defects in the indictment are available to reverse a judgment of conviction. *Connors* v. *United States,* 158 U. S. 408.

THE facts are stated in the opinion.

*Mr. Austen G. Fox* and *Mr. John D. Lindsay,* with whom *Mr. Albert H. Harris* was on the brief, for plaintiff in error.

*Mr. Henry L. Stimson,* with whom *The Attorney General* and *Mr. Assistant Attorney General Ellis* were on the brief, for defendant in error,

MR. JUSTICE DAY delivered the opinion of the court.

This case was argued and submitted with No. 57, just decided. In the Circuit Court of the United States for the Southern District of New York the plaintiff in error was convicted by the verdict of a jury, and sentenced under the Elkins act, 32 Stat. 847, to pay a fine of $18,000. The indictment consisted of two counts. The first charges the establishment and

publication of the tariff rate upon sugar over the line of the plaintiff in error and other railroads, from the city of New York to the city of Cleveland, Ohio, at the rate of 21 cents per hundred pounds; that on November 20, 1902, the railroad company entered into an unlawful agreement with the shipper, the American Sugar Refining Company, whereby its sugar should be shipped over said lines, and the lawful tariff being paid thereon the railroad company would give a rebate to the shipper of 6 cents for each hundred pounds of sugar transported to Cleveland, Ohio, for reconsignment to points beyond, and a rebate of 4 cents for each one hundred pounds transported to Cleveland for local delivery. The agreement further stipulated that the shipper should present its claim for rebate under the agreement aforesaid, and the same should be paid by the railroad company, thereby reducing the published tariff by 6 cents, or 4 cents for each hundred pounds of sugar, according to the destination thereof. The carriage of sugar under the arrangement was charged, payment of the published tariff rates, and the presentation of claims for rebates is also alleged, and it is charged that on April 3, 1903, the railroad company paid to the American Sugar Refining Company $26,141.81 by way of rebate in respect of the transportation of sugar under the agreement.

The second count is substantially the same as the first, except the allegation of the preliminary arrangement to pay the rebates is omitted. The record discloses that the plaintiff in error and other railroad companies, during the time covered in the indictment, had established and were operating a fast freight line from the city of New York to the city of Cleveland; that the published rate for the transportation of sugar over said route from New York to Cleveland was 21 cents per hundred pounds; that Nathan Guilford and Fred L. Pomeroy, the general freight traffic manager and the assistant freight traffic manager, respectively, of the defendant were authorized to establish rates at which freight was to be carried, and to unite with other companies in establishing, filing and publishing a list

of through rates. The record also discloses that the American Sugar Refining Company was a New Jersey corporation engaged in refining sugar in Brooklyn and Jersey City; that it made large shipments to Cleveland as well as to other parts of the country; that the sales department of the company, which routed the sugar sold to different parts of the country and transported over different railroads, acted according to instructions received from one Lowell M. Palmer, who was in charge of the handling of the railroad business of the company, and furnished the sales department with freight rates and arrangement of routes for the shipments. It also appears that on the twenty-fourth day of July, 1902, with an assistant named Riley, Palmer met Pomeroy at his office, and a memorandum was thereupon made evidencing an agreement between the parties as follows:

"*Memorandum made July 24, 1902.*

"Present—,

"Mr. L. M. Palmer, Mr. T. P. Riley, Mr. F. L. Pomeroy.

"Sugar shipments to Cleveland and beyond:

"1st. Shipments to be billed from New York regular tariff rate 21 cents per 100 pounds.

"2d. Mr. L. M. Palmer to be allowed as lighterage in regular monthly settlements 4½ cents per 100 pounds.

"3d. Mr. L. M. Palmer to present no claims for cartage or transfer on sugar consigned under the arrangement to the American Sugar Refining Company, Merwin Street, Cleveland.

"4th. The New York Central to make reclamation against Mr. L. M. Palmer for a refund of 1½ cents per 100 pounds, account lighterage allowed him in regular billing. This amount to be handed to the New York Central by Mr. L. M. Palmer in cash.

"5th. Mr. L. M. Palmer to make a special claim under personal cover to F. L. Pomeroy against the New York Central for overcharge on such shipments of sugar to Cleveland as are covered by the first clause of this memorandum on the basis of 6 cents per 100 pounds.

"6th. This arrangement to apply to all sugar billed to Merwin Street Warehouse, whether delivered locally in Cleveland or reconsigned beyond Cleveland. The question of exactly what the net basis is to be on shipments under this arrangement delivered locally in Cleveland to remain in abeyance until Mr. Guilford's return for submission to him as to his understanding of the arrangement. In any event the difference in the rate between sugar delivered locally and reconsigned not to exceed 2 cents per 100 pounds."

Afterwards, by an exchange of letters between Palmer and Guilford, 4 cents a hundred pounds was fixed as the rebate to be allowed on sugars delivered in the city of Cleveland, and 6 cents upon shipments reconsigned beyond the city of Cleveland. Between July 24, 1902, and December 6, 1902, the American Sugar Refining Company shipped a large amount of sugar from New York to Cleveland, paying thereon the full tariff rate of 21 cents per one hundred pounds. Thereafter claims were made up under the direction of Palmer against the New York Central and Hudson River Railroad Company, purporting to be for overcharges, and which were made upon the basis agreed upon in the memorandum aforesaid, and no evidence was introduced in the case showing that these rebates had any legitimate ground to rest upon. These claims were allowed and paid as hereinafter stated.

Objections as to the constitutionality of the Elkins act were made in this case, and as they are disposed of in the opinion announced in No. 57, just decided, the conclusions therein stated need not be repeated. The point principally urged for a reversal of the judgment in this case turns upon the construction of the Elkins act, having reference to the fact that the property concerning which the agreement for a rebate was made was transported prior to the taking effect of the Elkins act, February 19, 1903. In this case the agreement was made July 24, 1902, and the goods were actually transported before the act went into effect. The payment of the rebate was made on April 2, 1903, after the act went into effect. As we have

already had occasion to hold in No. 57, *ante,* where the legal tariff rate was, in fact, paid by the shipper to the carrier, the rebating was not complete until the money was actually refunded. The legal and published rate was the one which the carrier was obliged to pay, and no arrangement for any different rate could have been enforced at any time against the carrier. *Texas & Pacific Railway Co.* v. *Mugg,* 202 U. S. 242; *Gulf Railroad Co.* v. *Hefley,* 158 U. S. 98.

Before considering the terms of the Elkins act it is to be noted that the arrangement for the rebate was an illegal act, for which the agents of the carrier might have been criminally punished in accordance with the terms of the Interstate Commerce act then in force. Sections 6 and 10, 25 Stat. 855. The Elkins act amended the former law by providing punishment in criminal proceedings against the corporation as well as its agents for the offense of making illegal rebates from the published tariff rates. There was then no vested right in the shipper or the carrier to have the illegal agreement consummated by the payment of the rebate arranged for. In this attitude and with the purpose of making the law more effectual it was amended by the Elkins act so as to bring corporations within the provisions of the law and to make offenses under it punishable by criminal proceedings against corporations.

The Elkins act provides:

" And it shall be unlawful for any person, persons, or corporations to offer, grant or give, or to solicit, accept or receive any rebate, concession or discrimination in respect of the transportation of any property in interstate or foreign commence by any common carrier subject to said act to regulate commerce and the acts amendatory thereof, whereby any such property shall by any device whatever be transported at a less rate than that named in the tariffs published and filed by such carriers as is required by said act to regulate commerce and the acts amendatory thereto, or whereby any other advantage is given or discrimination practiced." C. 708, 32 Stat. 847.

It is the contention of the plaintiff in error that the language

of this statute addresses itself to the future, and it asks the application of the well-known rule that statutes are presumed to be prospective in their operation, and contends that this act has no reference to property transported in interstate commerce at less than the published rates at any time before the act went into effect. Reading the latter part of the sentence, "whereby any such property shall by any device whatever be transported at a less rate," etc., the act would seem to have reference to future transportations only. But in an earlier part of the same sentence it has been provided that it shall be unlawful to offer, grant, or give, to solicit, accept or receive any rebate in respect to property in interstate commerce, transportation "whereby any such property shall be transported at a less rate than that named in the tariffs," etc. Taking the sentence altogether it is apparent that its purpose is to punish the giving of a rebate, in respect of transportation of property in interstate commerce, which shall have the effect to give or receive such transportation at less than the published rates.

Manifestly the act does not refer alone to the transportation of the property, although that is an essential element of the offense, but the thing aimed at is the giving or receiving of a rebate whereby the property shall be transported at less than the rates named in the published tariffs. It is the transaction of giving or receiving the rebate, etc., with the effect that the goods of the shipper thus preferred shall be transported at a reduction from the published rates, which is penalized.

As we have had occasion to say in No. 57, *ante*, the giving of the rebate is complete and the offense committed when a part of the legal rate already paid has been refunded. The word *shall* refers to the happening of the event—the giving of the illegal rebate—and was not introduced into the statute for the purpose of making future transportation illegal. No new legislation was required to make transportation under such an agreement illegal. The object of the statute was to punish rebates given or received after the passage of the act in respect of prop-

erty, the subject of interstate transportation, and to make the carrier corporation criminally liable therefor.

We think that the Circuit Court was right in holding that this section of the law applied to the rebate paid in April, 1903, after the taking effect of the Elkins act.

Objections were taken to the indictment, but we think that it sets forth with sufficient definiteness the elements of the offense of which it was intended to charge the plaintiff in error. At this stage of the proceedings only substantial defects in the indictment are available to reverse the judgment of conviction. *Connors* v. *United States,* 158 U. S. 408, 411.

Error is alleged to have been committed in what the court said to the jury upon their return into court after the charge. The record upon this subject is as follows:

"The court thereupon charged the jury further as follows:

"Gentlemen, I have received this paper from the foreman of the jury: 'Does the payment of rebate after the passage of the Elkins act on shipments made before the passage of the act constitute a crime under the law?'

"To that I reply that it does, provided the payment was made with a criminal intent. That criminal intent does not mean with any wicked intent. The payment of rebates is not morally a crime. It was made a misdemeanor by statutes, and if a corporation or officer of a corporation pays a rebate with an intent thereby to make the payment in violation of the provisions of the statute prohibiting it, he does it with a criminal intent.

"There are three provisions in this act under either one of which, if you find that the evidence supports the charge, you may convict. If you find upon the evidence in this case that Mr. Guilford or Mr. Pomeroy was guilty of charging, demanding, collecting or receiving from the American Sugar Company a less compensation for the transportation of the sugar mentioned in the indictment than the rate specified in the schedule filed with the commission, you may find the defendant guilty.

"Under another provision of this act if you find that this

defendant has been guilty of a wilful failure to strictly observe the tariff filed specifying the rates for the transportation of sugar, you may find them guilty. Or, if you find that this corporation has offered, granted or given any rebate concession or discrimination upon the property transported in this case, 'whereby any such property shall by any device whatever be transported at a less rate than is fixed in the schedule,' you may find the defendant guilty, provided in each of these cases you find the criminal intent when the act was done, by which is meant an intention to do an act which violates this law. You may retire, gentlemen.

"Mr. LINDSAY: I would like to call your honor's attention to the fact that you instructed the jury they might find the defendant guilty if they 'offered.' There is no charge in this indictment of offering.

"The COURT: I did not say offer, I think.

"Mr. LINDSAY: Your honor used the word offer.

"The COURT: I withdraw that expression if I used it. I did not intend to use it.

"Mr. LINDSAY: I also ask your honor in this connection to charge as this indictment is framed under the Elkins law they cannot convict the defendant upon this indictment for anything which transpired before the going into effect of the Elkins act.

"The COURT: Undoubtedly the payment of the rebate must have taken place after the passage of the act. The fact that the property was transported before the passage of the act does not bar a conviction in this case."

It is contended that the effect of this charge was to permit the defendant to be convicted of violating the act of 1887 as amended in 1889, 25 Stat. 855, while the charge in the indictment, framed under the Elkins act, was intended to reach an offense committed after it went into effect, and to cover the unlawful rebate alleged to have been paid in April, 1903, after the taking effect of that act. But we think this part of the record should be read in connection with the charge of the court to the jury, in which the court gave a history of the previous

act to regulate commerce, under § 6 of which it is provided,
that "it shall be unlawful for such common carrier to charge,
demand, collect or receive from any person or persons a greater
or less compensation for the transportation of persons or prop-
erty, or for any services in connection therewith, between any
points as to which a joint rate, fare or charge is named thereon
than is specified in the schedule filed with the commission in
force at the time," and referred in that connection to the amend-
atory character of the Elkins act and the provisions thereof
making the act, omission or failure of the officer, agent, etc.,
within the scope of his employment, the act, omission or failure
of the carrier as well as such person. This part of the charge
was apparently by way of introduction to the charge covering
the specific requirements of the Elkins act. The judge in his
charge summarized and commented upon the facts proved or
admitted in the case, and in concluding said:

"Now, gentlemen, no evidence has been offered on behalf of
the defendant in the case, and I understand from the argument
of counsel that the defendant's defense in the case is the denial
of any criminal intent. Gentlemen, intent is essential to the
establishment of any charge of crime. Of course there may be
legitimate overcharges; there may be repayments for money
paid to a railroad company that are perfectly innocent and
proper. Very frequently it occurs that some error or mistake
or claim of injury arises when goods are being shipped, and that
sort of thing gives rise to reclamation and claims of that sort,
and the question for you to decide in this case is what was the
intent with which that check for $26,000 and odd was paid?
Was it paid as a pure rebate as described in this Elkins act and
in the Interstate Commerce act, or was it paid for some legiti-
mate and proper overcharge or cause? That is the simple ques-
tion in this case for you to determine, and that question I leave
for you to pass upon on the consideration of all the evidence in
the case."

This charge, taken in connection with what occurred when
the jury returned, and the colloquy which followed between

court and counsel, does not, we think, leave in doubt that the court submitted to the jury as a basis of conviction only the acts which occurred after the passage of the Elkins act. The acts amounting to a violation of that law were specifically charged in the indictment and admitted or proved at the trial.

The charge, taken together, submitted the question of the intent of the defendant to do, through the acts of its agents authorized by it, the things denounced in the statute. The charge was as favorable as the plaintiff in error was entitled to, and we find no substantial error in the proceedings.

*Judgment affirmed.*

MR. JUSTICE MOODY took no part in the decision of the case.