## BURNS v. UNITED STATES.

ERROR TO THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA.

No. 135. Argued November 24, 1926.—Decided May 16, 1927.

1. The California statute defining and punishing criminal syndicalism is not violative of the Fourteenth Amendment. *Whitney* v. *California, post,* p. 357. P. 330.

2. An instruction to a jury must be considered in connection with the evidence bearing on the matter to which it refers and with the charge as a whole.  P. 331.

3. To advocate among workers such acts as maliciously stowing the cargo of a ship so that it will shift and cause her to list and return to port, is to teach and abet " sabotage," which is defined by the California statute as meaning " wilful and malicious damage or injury to physical property "; it is also to teach and abet " crime " and " unlawful methods of terrorism." P. 332.

4. In a prosecution under the California Act Against Criminal Syndicalism, it is not necessary to show that the elements of criminal syndicalism were advocated or taught with the precision of statement required in indictments for criminal acts involved.  The purpose and probable effect of the printed matter circulated and of the things said in furtherance of the declared purposes of the organization are to be considered, having regard to the capacity and circumstances of the persons sought to be influenced. P. 335.

5. Exceptions to a charge must be specifically made in order to give the court opportunity then and there to correct errors and omissions, if any; and where a series of instructions are excepted to in mass, the exception will be overruled if any one of them is correct.  P. 336.

6. An instruction in a criminal case authorizing the jury to consider certain facts, must be sustained when the record does not purport to contain all the evidence relating to the things referred to, and where it can not be said as a matter of law that they would be improper for consideration if taken in connection with other facts. P. 336.

Affirmed.

ERROR to a judgment of the District Court sentencing Burns upon his conviction of the crime of criminal syndicalism, under the California law as extended to Yosemite National Park.

*Mr. R. W. Henderson,* with whom *Mr. Walter H. Pollak* was on the brief, for plaintiff in error.

*Solicitor General Mitchell,* with whom *Assistant Attorney General Luhring* and *Mr. Harry S. Ridgely,* Attorney in the Department of Justice, were on the brief, for the United States.

MR. JUSTICE BUTLER delivered the opinion of the Court.

An Act of Congress of June 2, 1920, § 1, c. 218, 41 Stat. 731, provides that, if any offense shall be committed in the Yosemite National Park which is not prohibited by a law of the United States, the offender shall be subject to the same punishment as the laws of California prescribe for a like offense. Plaintiff in error was indicted for violating within that Park the California Criminal Syndicalism Act, c. 188, California Statutes 1919. The indictment was in two counts. The verdict was guilty on the first count and not guilty on the second. Plaintiff in error, by demurrer and by motion to arrest the judgment, insisted that the statute contravenes the Constitution of the United States. His contention was overruled. The case is here under § 238 of the Judicial Code, before the Amendment of February 13, 1925.

The applicable provisions follow: "Section 1. The term ' criminal syndicalism ' as used in this act is hereby defined as any doctrine or precept advocating, teaching or aiding and abetting the commission of crime, sabotage (which word is hereby defined as meaning wilful and malicious physical damage or injury to physical property), or unlawful acts of force and violence or unlawful methods of terrorism as a means of accomplishing a change in industrial ownership or control, or effecting any political change. Section 2. Any person who: . . . . organizes or assists in organizing, or is or knowingly becomes a member of, any organization, society, group or assemblage of persons organized or assembled to advocate, teach or aid and abet criminal syndicalism . . . . is guilty of a felony . . ."

Plaintiff in error here contends that, as applied in the district court, these provisions are repugnant to the due process and equal protection clauses of the Fourteenth Amendment. The only attack upon the validity of the law was by the demurrer and motion in arrest. In each

of these, he asserted that the statute "is in violation of the Fourteenth Amendment of the Constitution of the United States and is void for uncertainty." But that point is determined adversely to his contentions in *Whitney* v. *California, post,* p. 357.

The substance of the count on which plaintiff in error was adjudged guilty is that on or about April 10, 1923, at Yosemite National Park, he did "organize, and assist in organizing, and was, is, and knowingly became, a member of an organization, society, group and assemblage of persons organized and assembled to advocate, teach, aid and abet criminal syndicalism, to wit, The Industrial Workers of the World, commonly known as I. W. W."

1. Plaintiff in error argues that he is entitled to a new trial because the charge contains the following: "Now, there has been presented to you evidence . . . to the effect that this organization, amongst other things, advocated what is known as slowing down on the job, slack or scamped work, such as loading of a ship in such a way that it took a list to port or starboard and therefore had to limp back to port, and things of that kind. I instruct you that under the definition as laid down by the legislature of California, that any deliberate attempt to reduce the profits in the manner that I have described would constitute sabotage." He calls attention to the language in section 1 and says that merely loading telephone poles on a ship so as to occasion more work is not physical damage or injury to physical property within the meaning of the statute.

If that instruction stood alone it might be thought to permit the jury erroneously to expand the meaning of sabotage beyond that defined in the Act. But it does not stand alone; and the mere comparison of the quoted language of the instruction with the words of the statute is not sufficient to disclose whether there was prejudicial error. The instruction must be taken in connection with

the evidence bearing on the matter referred to and is to be considered in the light of the charge as a whole. *New York Cent. R. R.* v. *United States,* 212 U. S. 500, 508; *Hatema* v. *United States,* 186 U. S. 413, 416; *Spring Drug Co.* v. *United States,* 12 F. (2d) 852, 856; *People* v. *Scott,* 6 Mich. 287, 291. There is no contention that plaintiff in error was not connected with the organization substantially as alleged, or that the evidence failed to show it to be the kind of organization specified in the indictment. The record shows that for a number of years he had been a member of the organization; that, at the time alleged and when arrested, he was its authorized delegate and had a quantity of its literature in his possession; that he solicited others to become members and was authorized to initiate new members and to collect initiation fees and dues. It also shows that the organization disseminated large amounts of printed matter declaring its purposes and advocating means to accomplish them. A " preamble " was contained in practically all its publications and was printed on the membership card of plaintiff in error. It declares that the working class and employing class have nothing in common; that a struggle must go on between them until the workers organize, take possession of the earth and the machinery of production and abolish the wage system; that the trade unions aid the employing class to mislead the workers into the belief that they have interests in common with their employers; that, " instead of the conservative motto, ' A fair day's wages for a fair day's work,' we must inscribe on our banner the revolutionary watchword, 'Abolition of the wage system; ' " that it is the mission of the working class to do away with capitalism; that the army of production must be organized to carry on when capitalism shall have been overthrown; that " by organizing industrially we are forming the structure of the new society within the shell of the old."

Sabotage, as the evidence indicates it to have been advocated and taught by the organization, is not confined, as is the definition contained in the Act, to physical damage and injury to physical property. The organization's printed matter that was received in evidence contains no precise definition of sabotage, but does give a number of descriptive explanations of what it means. As fairly illustrative, we take the following: " Three versions are given of the source of the word. The one best known is that a striking French weaver cast his wooden shoe—called a sabot—into the delicate mechanism of the loom upon leaving the mill. The confusion that resulted, acting to the workers' benefit, brought to the front a line of tactics that took the name of sabotage. Slow work is also said to be at the basis of the word, the idea being that wooden shoes are clumsy and so prevent quick action on the part of the workers. The third idea is that sabotage is coined from the slang term that means ' putting the boots ' to the employers by striking directly at their profits without leaving the job. The derivation, however, is unimportant. It is the thing itself that causes commotion among employers and politicians alike." The evidence shows that the organization advocated, taught and aided various acts of " sabotage " that are plainly within the meaning of that word as defined by the Act. Some examples are: injuring machinery when employed to use it, putting emery dust in lubricating oil, damaging materials when using them in manufacture or otherwise, scattering foul seed in fields, driving tacks and nails in grape vines and fruit trees to kill them, using acid to destroy guy wires holding up the poles provided to support growing vines, putting pieces of wire and the like among vines to destroy machines used to gather crops, scattering matches and using chemicals to start fires to destroy property of employers. One of the witnesses testified: " I heard . . . a member of the I. W. W. say in

a speech on May 10th, 1923: ' When you go back to work, if we do have to go to work, we will put on the wooden shoe.' Then he said: ' In case you are loading telephone poles on a ship down there, sometime the boss is not looking you can slip a couple of poles crossways and then cover up, and then when that ship goes to sea naturally she will start rolling and the cargo will shift, and then she will come in listed like the one you see out in the harbor, then she has got to tie up to the dock, and she will have to unload the telephone poles and put them in again and put them straight, and then we will get paid for the loading originally, and get paid for unloading it and get pay for loading it again, and that will hit the bosses hard in the pocketbook.' "

The foregoing sufficiently shows the foundation of fact for the portion of the charge complained of. Before giving that instruction, the court warned the jury that the Government must establish beyond reasonable doubt that the I. W. W. was such an organization as is denounced by the Act. The definition of criminal syndicalism was given the jury in the exact words of the statute. The court then gave a number of lexicographers' definitions of sabotage. They are broader than the meaning of the word as defined in the Act and are not confined to physical damage or injury to physical property. Then, by way of contrast, the statutory definition of sabotage was repeated, and by the repetition it was emphasized. The court said: " The statute, itself, you will notice, however, denounces sabotage as meaning wilful and malicious physical damage or injury to physical property." The instruction complained of followed. It referred to the evidence indicating that the organization advocated acts *such as* loading a ship so that it would list and have to return, *and things of that kind.* And in that connection the court said that any deliberate attempt to reduce profits *" in the manner that I have described "* would

constitute sabotage. The language excepted to was followed by an instruction containing this: "If you find, therefore, that this organization advocated *sabotage* or any *other criminal matters mentioned in the section that I have read,* either for the purpose, of bringing about a change in industrial control, or a political change, then it would constitute criminal syndicalism."

While one of the purposes of such improper loading of ships may be to create more work for the men and so to inflict loss on employers, it is also plainly calculated to endanger the vessels, their cargoes and the lives of those aboard. By the instruction complained of, the consideration of the jury was limited to "things of that kind." The advocating of the malicious commission of such acts is to teach and abet sabotage—physical damage and injury to physical property; it also is to teach and abet crime and unlawful methods of terrorism. It was not necessary for the prosecution to show that the elements of criminal syndicalism were advocated or taught with the precision of statement required in indictments for criminal acts involved. Cf. *Wong Tai* v. *United States,* 273 U. S. 77. The purpose and probable effect of the printed matter circulated and of the things said in furtherance of the declared purposes of the organization are to be considered having regard to the capacity and circumstances of the persons sought to be influenced. When there is taken into account the evidence referred to and the parts of the charge preceding and following the part of the charge here assailed—and especially the giving and reiteration of the statutory language defining sabotage—it is quite apparent that the instruction was not erroneous.

Both sides have dealt with the case here as if the question were properly raised, and we have considered its merits. *McNitt* v. *Turner,* 16 Wall. 352, 362; *Baltimore & Potomac Railroad* v. *Mackey,* 157 U. S. 72, 86; *Nor-*

*folk & Western Ry.* v. *Earnest,* 229 U. S. 114. Cf. *West* v. *Rutledge Timber Co.,* 244 U. S. 90, 99–100. But, after examining the record, we think plaintiff in error failed to make any objection or effectively to take exception to the charge complained of. The exception there indicated did not call the court's attention to the instruction now attacked. It was general in form and applied to the series of statements that followed it, covering about two pages of the record. Plaintiff in error does not contend that all of them are erroneous, and obviously they are not. The rule is well-established that, where a series of instructions are excepted to in mass, the exception will be overruled if any one of them is correct. *Johnston* v. *Jones,* 1 Black 209, 220; *Beaver* v. *Taylor,* 93 U. S. 46, 54; *McDermott* v. *Severe,* 202 U. S. 600, 610. Exceptions to a charge must be specifically made in order to give the court opportunity then and there to correct errors and omissions, if any. *Pennsylvania R. R. Co.* v. *Minds,* 250 U. S. 368, 375, and cases cited; *Allis* v. *United States,* 155 U. S. 117, 122. Even if some of the instructions were erroneous, the exceptions taken were not such as to require a new trial.

2. Plaintiff in error complains of another part of the charge: " There has been evidence here that advertisements were published in the official organs of the Industrial Workers of the World, what they call also stickerettes, calling upon people to boycott the entire State of California and its products. That would only be legal in the event that it was in furtherance of a strike, and by ' legal ' I mean as established by the State of California, that is to say, if it was in furtherance of a strike, if it was in good faith, an attempt to better their conditions, and if it did not indulge in maliciousness or misrepresentation. If, however, you should find from the evidence that that was not so, then it would be an illegal

boycott and you could take it into consideration in determining the facts of this case."

The record does not contain all the evidence and fails to show that it includes all relating to the matter referred to in this instruction. We think it cannot be said as a matter of law that the things there mentioned, when taken in connection with other facts, may not have been proper for consideration in connection with some element of the criminal syndicalism charged. Moreover, no objection was made or exception properly taken to that part of the charge. Here again the exception failed specifically to point out the instruction now assailed as erroneous.

*Judgment affirmed.*

MR. JUSTICE BRANDEIS, dissenting.

This writ of error was allowed under § 238 of the Judicial Code, on constitutional grounds, prior to the amendment of February 13, 1925. All alleged errors at the trial which were properly excepted to are therefore, before us. *Chaloner* v. *Sherman*, 242 U. S. 455, 457. There was, at least, one error committed which, in my opinion, justifies reversal and which does not involve a constitutional question. For that reason, according to the practice approved by the Court, I refrain from discussing the constitutional questions presented. See *Steamship Co.* v. *Emigration Comm'rs*, 113 U. S. 33, 39; *Chicago & G. T. Ry. Co.* v. *Wellman*, 143 U. S. 339, 345; *Howat* v. *Kansas*, 258 U. S. 181, 184.

The defendant was convicted on the count which charges him with becoming a member of an organization formed to advocate criminal syndicalism. The California statute defines criminal syndicalism as advocating sabotage, among other things; and it defines sabotage " as

meaning wilful and malicious physical damage or injury to physical property." To prove the crime, the Government undertook to show that the defendant was a member of the I. W. W. and that the I. W. W. advocated, among other things, the use of sabotage. On that subject the trial judge gave the following instruction, which was duly excepted to:

. "Sabotage has been variously defined. Webster's New International Dictionary defines it as 'Scamped work; malicious waste or destruction of an employer's property by workmen during labor troubles.' Funk & Wagnalls' New Standard Dictionary defines it as: 'Any poor work or other damage done by dissatisfied workmen; also, the act of producing it; plant wrecking.' Nelson's Encyclopedia defines it thus: 'The organized hampering of production by slack work, skilful disabling of machinery or the publication of trade secrets.' The New International Encyclopedia defines it thus: 'Sabotage may consist in throwing the progress of production out of order, through tampering with machinery, improper use of material, or loitering at work.' The Encyclopedia Americana defines it as: 'A method used by labor revolutionists to force employers to accede to demands made on them. It consists in wilful obstruction and interference with the normal processes of industry. It aims at inconveniencing and tying up of production, but stops short of actual destruction or of endangering human life directly.'

"The statute, itself, you will notice, however, denounces sabotage as meaning wilful and malicious physical damage or injury to physical property.

"Now, there has been presented to you evidence, of the truth or falsity of which, however, you are the exclusive judges, to the effect that this organization, amongst other things, advocated what is known as slowing down on the job, slack or scamped work, such as loading of a ship in such a way that it took a list to port or starboard

and therefore had to limp back to port, and things of that kind. I instruct you that under the definition as laid down by the legislature of California, that any deliberate attempt to reduce the profits in the manner that I have described would constitute sabotage."

The testimony referred to by the court in the above instruction was this:

" Under similar circumstances I heard Leo Stark, a member of the I. W. W., say in a speech on May 10th, 1923: ' When you go back to work, if we do have to go to work, we will put on the wooden shoe.' Then he said: ' In case you are loading telephone poles on a ship down there, sometime the boss is not looking you can slip a couple of poles crossways and then cover up, and then when that ship goes to sea naturally she will start rolling and the cargo will shift, and then she will come in listed like the one you see out in the harbor, then she has got to tie up to the dock, and she will have to unload the telephone poles and put them in again and put them straight, and then we will get paid for the loading originally, and get paid for unloading it and get pay for loading it again, and that will hit the bosses hard in the pocketbook.

" Mr. LEWIS. I move that that answer be stricken out as immaterial, irrelevant and incompetent, not within the definition of sabotage as laid down in the statute, or the Criminal Syndicalism law.

" The COURT. I cannot see it. As I said before, I cannot see but what any deliberate act, the purpose of which is to reduce the profits of the physical thing, is not equally an injury. Motion denied.

" Mr. LEWIS. I note an exception."

The exception to the charge is insisted on, although the objection to the admission of the evidence is not urged here. The charge was clearly erroneous. It plainly directed the jury that " slowing down on the job " and " scamped work " constituted sabotage within the mean-

ing of the statute. Since the jury must have taken it to be an exposition or interpretation of the words of the statute, the error was not cured by definition, elsewhere in the charge, of sabotage in the terms of the statute. The court ruled throughout the course of the trial, that evidence to show a program of scamped work was admissible. Much of the Government's evidence consisted of documents showing such a program on the part of the I. W. W. The charge inevitably led the jury to think that all such evidence showed the guilty character of the organization.

It is said that the charge, if erroneous, was not prejudicial, because the illegal character of the organization was established by other evidence than that which formed the basis of the charge, and because even the latter evidence showed the advocacy of acts which amounted to a malicious destruction of property, and so might properly support a conviction even under a proper construction of the statute. Even in civil cases erroneous rulings, especially those embodied in instructions, are presumptively prejudicial. Filippon v. Albion Slate Co., 250 U. S. 76, 82; United States v. River Rouge Co., 269 U. S. 411, 421. The illegal character of the organization was not conceded. There was evidence from which the illegal character might have been deduced. But the evidence related, in the main, to the acts of individuals. The effort of the defense was to disavow those acts.

It is also said that the exception to the charge was not properly taken. The defendant excepted specifically to that portion of the charge which dealt with sabotage. The precise ground of the exception was not set forth. But the continued objections to the admission of evidence upon the ground here urged, and the court's adverse rulings thereon, could have left no doubt in the mind of the court as to what was meant by the exception here in question. Moreover, the case comes to this

Court from a lower federal court. We have, therefore, the power to correct errors committed below although objection was not taken there. That power has been re- ·peatedly exercised in criminal cases. See *Wiborg* v. *United States,* 163 U. S. 632, 658–660; *Clyatt* v. *United States,* 197 U. S. 207, 221–222. This case, I think, warrants its exercise.

The judgment should be reversed.