## MANSFIELD et al. v. UNITED STATES.[*]
### No. 10073.

Circuit Court of Appeals, Eighth Circuit.
March 9, 1935.

[*]Rehearing denied June 17, 1935.

J. M. Johnson, H. C. Doyle, and Donald W. Johnson, all of Kansas City, Mo., for appellant.

Maurice M. Milligan, U. S. Atty., and S. M. Carmean, Asst. U. S. Atty., both of Kansas City, Mo.

Before WOODROUGH, Circuit Judge, and FARIS and DONOHOE, District Judges.

WOODROUGH, Circuit Judge.

This appeal is taken by Wilber J. Mansfield and Frank B. Mansfield to reverse their conviction under an indictment charging use of the mails and conspiracy to use the mails in furtherance of a scheme to defraud and to obtain money by false representations in violation of section 215 of the Penal Code (18 USCA § 338).

They were managing officers of the Universal Bond & Mortgage Company, a Missouri corporation, organized under the name of Union Bond & Mortgage Company in May, 1928, and operated until receiver was appointed in August, 1932. Its ostensible business was to make investments in first mortgages on improved real estate on a 50 per cent. valuation and in municipal, state, and United States government bonds, and to deal in like conservative securities. To provide capital, the corporation had a license from the Commissions of Missouri and Kansas to sell the shares of its preferred and common stocks and also what it called its guaranteed bonds. The bonds were to be sold mainly on a monthly installment plan which called for payments at the rate of $6.15 a month for 10 years, or 120 months, on each thousand dollars of bonds.

The enterprise contemplated that many people should be induced to turn their savings over to the corporation and that the officers in control would handle the funds so obtained with skill and honesty; the evidence was that, if sufficient business of that kind could be got and if the installment payments on the so-called guaranteed bonds were collected for the company and wisely and honestly invested with skill and care, enough interest could be earned during the period covered by the bond contract to enable the company to pay off the amount of the bonds and also to pay its expenses and gain a profit. But it is apparent that the solicitation of money from the general public for such an enterprise and the handling of the funds obtained by such solicitation imposed responsibility on those in charge to refrain from making representations that were untruthful and from dealings that were not honest.

The indictment was in the usual form that has been evolved in the federal courts to present that those in control of the promotion and operation of such a corporate enterprise used false representations to obtain money from the public and dishonest practices to divert it, and were parties to a fraudulent scheme and conspired to and did use the mails in furtherance thereof.

There was substantial testimony for the government to the effect that, when Wilber J. Mansfield first started up the corporation in 1928, he caused it to issue its preferred capital stock of the par value of $60,000 and 600 shares of no-par stock, and he put into the corporation as consideration for such original first stock issue a deed to property in Kansas City called Landis Court. Landis Court had two mortgages against it at the time totaling $79,000, and the estimated worth of the equity deeded to the corporation was $60,000. This equity in Landis Court Mr. Wilber J. Mansfield had acquired by trading vacant cut-over timber lands in Arkansas therefor in 1926, and he had kept his title in the name of a straw man who executed the deed to the corporation. But at some date between June, 1928, and February, 1929, the corporation deeded away its equity in Landis Court to another straw nominee of Wilber J. Mansfield's, who thereafter held it for him and it did not figure as an asset of the corporation. This nominee executed a number of mortgages on the property, and a minute in the records of the corporation indicates that one such mortgage for $60,000 was delivered to the company in substitution for the property itself, but that the mortgage was canceled and returned to the maker. It appears that Mr. Wilber J. Mansfield had another 3,400-acre tract of cut-over timber land in Arkansas standing in the name of a straw man, and that the consideration which ultimately went to the corporation for the preferred and common stock issued for the promoters was a mortgage executed by the straw man on the Arkansas land in the sum of $35,000. The land was valued by the government witnesses at two dollars to two and a half an acre, and was sold for taxes in 1930.

Both preferred stock and common issued on the original subscriptions was scattered among members of the Mansfield family and straw men who had no property or

interests of their own in it. The par value of the preferred was $100 per share, but the common had no par value, and was intended to be and was, on occasions, given as bonus in connection with the sale of the preferred stock and the so-called guaranteed bonds. An allotment of 5,000 shares of no-par common stock, however, was to be sold for a dollar a share, and these shares were mainly issued and distributed to members of the Mansfield family and straw men in the same manner as was the original subscription stock.

The company's plan for selling the stocks to the public contemplated the payment of a commission of 20 per cent. to the stock salesmen. Purchasers of the guaranteed bonds were to pay in some $73.80 in a twelvemonth on a $1,000 bond, and the salesman's commission on the transaction would be $55. It is clear that an investment company confined to dealing in ultra conservative securities would require meticulously honest and skillful management to show early earnings of a 6 per cent. dividend on a $100 share of stock which it issued for $80 net, and that it could only make payment of $1,000 at the end of 10 years to an installment savings depositor whose total payments would amount to $738, with $55 off for commission paid, by the same care and integrity.

But there was evidence for the government justifying belief that, when sales of the corporate stock of this corporation were made, the money of the purchasers was not turned to the uses of the corporation, but was in large measure appropriated by the Mansfields. Persons who were induced to buy the preferred stock for $100 a share and the common stock for $25 or $50 a share were supplied with the stock which had been issued on the original stock subscriptions, and the original allotment of 5,000 shares distributed at the rate of $1 a share (or lieu stock reissued therefor).

An early stock purchaser was Tena Rohn who gave $8,400 value for that amount of preferred stock, and on February 4, 1929, the corporate minutes include Tena Rohn's subscription among the original subscriptions, which original subscription was paid, so far as the corporation was concerned, by the Arkansas land mortgage. The bulk of the common stock, though distributed by the corporation at $1 a share or as a bonus, was sold to the public for from $25 to $50 a share. However feasible the plan of selling the guaranteed bonds for

savings investment may have been in its theory as a safe investment for the bond buyer and a money maker for the corporation, in the business of the corporation as it actually went forward it was manifestly impossible in conservative course to earn an income upon the large amount of money which the public had been induced to invest in the corporate stock. The distribution of the common stock had brought almost no capital into the corporation, and that was also true at least as to a large part of its preferred stock. That the company could immediately earn dividends upon the $25 and $50 paid for its common stock or upon the par value of its preferred was not credible. Nor did it do so. The credible testimony for the government was that the company fell far short of it each year and, in fact, lost money, notwithstanding it followed an accounting practice of entering and treating the expenses as capital investment deferred, and not charged off.

In the sale of the securities to the public, positive assurances were given that the money received from the sale of the stocks and bonds of the corporation would be invested only in United States government and municipal bonds and first mortgage loans secured by improved real estate of the type in which banks, insurance companies, and other careful investors put their money, and that investment in these shares would be safe, conservative, and profitable, and that the Universal Bond & Mortgage Company was a substantial business institution engaged in a successful and paying business, in a sound financial condition, with assets, including surplus and undivided profits, far in excess of its liabilities. "An enterprise free from commercial hazard. * * *" And that "the capital (of said corporation) is always safe" and "protected by the safest securities on earth," etc.

The record presents many instances in which these appellants directly and through their agents grossly deceived uninformed and gullible persons as to the real nature and worth of the Universal Bond & Mortgage Company stock and the assets behind it and by such means they obtained for themselves large amounts of money and property. The allegations of the indictment were sustained by substantial evidence, and the testimony required the submission of the fact issues to the jury.

The points argued in the brief of the appellants go to alleged errors committed on

the trial in receiving and excluding testimony and in instructions given and refused.

Particular complaint is made that the Mansfields offered testimony on the trial to show that the plan of the Universal Bond & Mortgage Company to sell its so-called guaranteed bonds was a sound business plan which had been carried on successfully by other companies, and that the Landis Court property had been valued at a large sum in written appraisals at or before the organization of the corporation, and that the trial court erroneously excluded the testimony. The contention is that the excluded testimony was relevant as to the intent of the defendants.

█ It is well settled that in prosecutions under section 215 of the Penal Code (18 USCA § 338) the intent of the defendant is the very gist of the inquiry, and the court may not exclude any evidence offered by defendant which tends to refute the fraudulent intent charged. But we do not find from the record that the trial court erred in this regard. It was not claimed for the government, and no testimony was offered to show, that the company's promise to pay $1,000 to those who invested $6.15 a month for 120 months, or to pay $1,000 at the end of the 10 years to those who paid $586, was fraudulent, even though the contract cost of getting the business was $55 a thousand. Mr. Wilber Mansfield was permitted to and did testify at length concerning his investigation of such a plan of business and that it was sound and successful. He said he had made extensive and costly investigation of other companies, and his conclusion was that they were the safest kind of companies—all before he organized the Universal Company. Only information brought home to the defendants could affect their belief and they were not prevented from detailing the same. There was no issue or charge of fraud concerning the mere form of business in which appellants engaged.

Nor does the record disclose erroneous exclusion of competent evidence offered to show the value of the Landis Court property and the Mansfield's honest belief in such value. The property was fully described by defendants' witnesses familiar with it (three-story brick apartment dwellings from 40 to 50 years old, containing some 83 apartments, which, if rented up to 85 per cent., would produce around $10,000 a year net income), and they valued it up to $160,000. No testimony was offered to show what the rentals actually were

while the property was owned by Mr. Wilber Mansfield. Although it was deeded to the corporation at the time of organization, it was soon deeded back to be held for the sole use and benefit of Wilber J. Mansfield, and ceased to be an asset of the corporation.

The evidence is that, while the title was held by straw men for Mr. Wilber J. Mansfield, they executed many mortgages upon it at his direction. His straw man, Robinson, executed one to Mr. Wilber J. Mansfield himself for $50,000, and the successor, Miss M. Ewing, executed no less than five mortgages aggregating some $270,000. It also appears that the Universal Bond & Mortgage Company made a loan of its own money in the amount of $65,000 upon the property, and the testimony of Mr. Frank B. Mansfield indicates that, although a first mortgage on the property was discharged at a large discount, it took the full amount of $65,000 and "still some more" to complete the loan, and that "everything was charged to the mortgage account and that any of the money that did not show for mortgages would go to Wilber Mansfield, the owner of the building, to reimburse him for money he had formerly paid on these mortgages." It does not appear that competent testimony to show the honest belief of the Mansfields in the large value of Landis Court was excluded or that such honest belief presented a defense to the fraud charges of the indictment.

█ Assignments of error numbered 10 and 29, to the effect that the court erred in excluding certain testimony of the witness Ross and certain written appraisals of the Landis Court property, are plainly defective, not only in form but in substance. They do not set forth any offers of proof, objections, rulings, or exceptions taken. There is likewise no reference to the printed pages of the record where proceedings complained of may be found. They violate rules 11 and 24 of this court. United States v. Nickle (C. C. A. 8) 70 F.(2d) 873; McCutchan v. United States (C. C. A. 8) 70 F.(2d) 658; Wagner Elec. Corp. v. Snowden (C. C. A. 8) 38 F.(2d) 599; Schmidt v. United States (C. C. A. 8) 63 F.(2d) 390.

██ The appellants contend that the court erred in charging the jury to the effect that every person is presumed to intend the natural and probable consequences of his own act. That portion of the charge complained of appears in the following instruction: "On the other hand, if you should find and believe from the evidence that there was no

scheme, that there was no use of the mails and no intention on the part of the parties to use the mails then it would be your duty to find the defendants not guilty. Now then, you ask me what I mean by intentions. The law is that every person is presumed to intend the natural and probable consequence of his own act, and so that if you, after having surveyed all the testimony in this case, under the indictment, you should find and believe from the evidence that there was a scheme and then if you go further and believe that the scheme was of such nature that the parties indubitably must have contemplated that the mails would be used, then that is enough; then you could find that there was an intention to use the mails to defraud. * * *"

It is elementary that the instruction as a whole must be considered when error is assigned to a portion thereof. Carnahan v. United States (C. C. A. 8) 35 F.(2d) 96, 67 A. L. R. 1035.

In a case where the main question for the jury was whether the defendant made certain representations with a fraudulent intent, this court condemned an instruction which attributed the fraudulent intent to the defendant as a presumption of law from the result of his acts. Shaddy v. United States (C. C. A. 8) 30 F.(2d) 342. See, also, Hibbard v. United States (C. C. A. 7) 172 F. 66. Our examination of the language used by the trial court in this case satisfies us that the same error is not presented here. The charge here in question, though not grammatically ornate, should leave no doubt in the minds of the jurors that they were to find the essential elements of the offense from a survey of all the testimony in the case. It informed them that the law presumes the innocence and not the guilt of the accused; and that such presumption attends and protects them until overcome by testimony which satisfies of their guilt beyond a reasonable doubt. Very similar instructions in Roper v. United States (C. C. A. 10) 54 F.(2d) 845, and Agnew v. United States, 165 U. S. 36, 17 S. Ct. 235, 41 L. Ed. 624, infra, were held to correctly state the law and be free from error. Laws v. United States (C. C. A. 10) 66 F.(2d) 870; Roper v. United States (C. C. A. 10) 54 F.(2d) 845; McCallum v. United States (C. C. A. 8) 247 F. 27; Cummins v. United States (C. C. A. 8) 232 F. 844; Agnew v. United States, 165 U. S. 36, 17 S. Ct. 235, 41 L. Ed. 624; McKnight v. United States (C. C. A. 6) 115 F. 972; Dell Aira v. United States (C. C. A. 9) 10 F.(2d) 102.

The appellants complain that under the charge as given the burden of proving a withdrawal from the conspiracy alleged in the indictment was placed upon them. The instruction was as follows:

"And I will say that if any person should withdraw from the scheme to defraud, if once he has entered into the scheme to defraud, then his withdrawal must be attended with such circumstances as to show conclusively or to show beyond a reasonable doubt—I mean to say that at least there must be a doubt as to whether or not he remained in.

"The testimony must show reasonably that he had withdrawn from such scheme, that he is no longer a part of such scheme to defraud; otherwise he would be held; if such an individual had participated in a scheme and set a train of circumstances in motion whereby the mails would be violated, then he would be justly as guilty as if he had himself mailed the letter."

In Local 167 v. United States, 291 U. S. 293, 297, 54 S. Ct. 396, 398, 78 L. Ed. 804, the court said: "The conspiracy was not for a temporary purpose but to dominate a great and permanent business. It was highly organized and maintained by the levy, collection, and expenditure of enormous sums. In the absence of definite proof to that effect, abandonment will not be presumed. Hyde v. United States, 225 U. S. 347, 369, 32 S. Ct. 793, 56 L. Ed. 1114, Ann. Cas. 1914A, 614; Nyquist v. United States (C. C. A.) 2 F.(2d) 504, 505."

In Hyde v. United States, 225 U. S. 347, 369, 32 S. Ct. 793, 803, 56 L. Ed. 1114, Ann. Cas. 1914A, 614, the court stated: "Nor does it take from a conspirator the power to withdraw from the execution of the offense or to avert a continuing criminality. It requires affirmative action, but certainly that is no hardship. Having joined in an unlawful scheme, having constituted agents for its performance, scheme and agency to be continuous until full fruition be secured, until he does some act to disavow or defeat the purpose he is in no situation to claim the delay of the law."

See, also, Stephens v. United States (C. C. A. 9) 41 F.(2d) 440; Sunderland v. United States (C. C. A. 8) 19 F.(2d) 202.

The instruction given by the court, when considered as a whole, falls fairly within the

law as announced by the Supreme Court. There must be definite proof of withdrawal, some affirmative step must be taken in disavowal of all future connection with the scheme to defraud. The instruction, in substance, required the jury to find some evidence that would create a doubt in their minds as to whether or not the appellants remained in the scheme or conspiracy to defraud before they would be justified in acquitting them of the conspiracy on the basis of such evidence. It does not relieve the government of the burden of establishing their guilt beyond a reasonable doubt. In its entirety, it was favorable to the appellants, and cannot be said to have resulted in prejudice.

There was no substantial testimony that Mr. Wilber J. Mansfield ever withdrew from the business of the Universal Bond & Mortgage Company and the sale of its securities. His testimony was: "I gave 100% of my time during the life of the company, except when I moved to the Waldheim Building, that was in July, 1931, I believe." And in 1933, immediately before the filing of the indictment, he was still actively engaged in the general enterprise. Although Mr. Frank B. Mansfield appears to have resigned as secretary and treasurer of the company in May of 1932, there is no evidence to justify the conclusion that he had, at any time, ceased to deal with the stocks of the company.

■ It is contended that the court erred in defining reasonable doubt as a doubt for which a reason could be assigned. Although no proper exception was taken preserving the question for review [McCutchan v. United States (C. C. A. 8) 70 F.(2d) 658; Stassi v. United States (C. C. A. 8) 50 F.(2d) 526], we are satisfied that no prejudice resulted from the form and substance of the instruction, which was as follows:

"These underlying principles are that the law presumes the innocence and not the guilt of the accused. This presumption attends and protects them and each of them until the Government has overcome such presumption by testimony which may satisfy you of their guilt beyond a reasonable doubt.

"By reasonable doubt I do not mean the mere fanciful, flimsy, fictitious notion that the defendants or either of them might be innocent but I mean, as the word implies, a doubt founded in reason and a doubt for which you could give a reason. It means a substantial doubt arising on the testimony or from lack of testimony, and such a doubt as would cause you as reasonable men to halt and to hesitate before you acted in the more serious matters of your own concerns."

An instruction in almost identical language was approved by the Supreme Court in Hopt v. Utah, 120 U. S. 430, 7 S. Ct. 614, 30 L. Ed. 708. See, also, Wilson v. United States, 232 U. S. 563, 34 S. Ct. 347, 58 L. Ed. 728; United States v. Woods (C. C. A. 2) 66 F.(2d) 262; Murphy v. United States (C. C. A. 3) 33 F.(2d) 896; Colbeck v. United States (C. C. A. 8) 14 F.(2d) 801, 803; Estabrook v. United States (C. C. A. 8) 28 F.(2d) 150; Pettine v. Territory of New Mexico (C. C. A. 8) 201 F. 489; Dunbar v. United States, 156 U. S. 185, 15 S. Ct. 325, 39 L. Ed. 390; Sotello v. United States (C. C. A. 5) 256 F. 721; Maupin v. United States (C. C. A. 4) 258 F. 607.

In Colbeck v. United States, supra, this court said: "It is also contended that there should be a reversal because the court erred in its instruction to the jury on the subject of reasonable doubt. The particular respect in which it is claimed the court erred on that subject is that it charged the jury that a reasonable doubt is a doubt based on reason and which is reasonable in view of all the evidence. If the court had stopped there the contention would be a serious one. But that was not all of the instruction. Taking the court's entire charge on that subject it is the same in substance as the instruction given in Hopt v. Utah, 120 U. S. 430, 7 S. Ct. 614, 30 L. Ed. 708, which the Supreme Court held did not constitute reversible error."

The part of the instruction complained of was qualified and explained by the sentence immediately following: "Such a doubt as would cause you as reasonable men to halt and to hesitate before you acted in the more serious matters of your own concerns." The instruction informs the jury that it was their duty to acquit if the evidence left them with such a doubt of guilt as a reasonable man would decline to act upon in his own affairs. Sotello v. United States, supra.

■ On the weight to be given evidence of the good reputation and character of the appellants, the court charged the jury, in substance, that, if the evidence of good reputation and character should raise a doubt of the guilt of the accused when considered with all the other testimony, they should be

acquitted. The appellants contend that evidence of good character alone may generate such a reasonable doubt as to entitle them to an acquittal and that the instruction places an undue burden upon the appellants.

The appellants, however, excepted to the charge in general terms which failed to direct the court's attention to the alleged error. The assignment, therefore, does not present anything for review. Estabrook v. United States (C. C. A. 8) 28 F.(2d) 150; Metzler v. United States (C. C. A. 9) 64 F.(2d) 203; Burns v. United States, 274 U. S. 328, 47 S. Ct. 650, 71 L. Ed. 1077; Stassi v. United States (C. C. A. 8) 50 F. (2d) 526; State Life Insurance Co. v. Sullivan (C. C. A. 9) 58 F.(2d) 741. The instruction, in fact, embodies in substance the charge requested by the appellants. We are satisfied that the charge was substantially correct and gave the appellants full benefit of the evidence upon the point. McAdams v. United States (C. C. A. 8) 74 F.(2d) 37, Nov. 14, 1934; Winter v. United States (C. C. A. 8) 13 F.(2d) 53; Linde¹ v. United States (C. C. A. 8) 13 F.(2d) 59; Capriola v. United States (C. C. A. 7) 61 F.(2d) 5; Edgington v. United States, 164 U. S. 361, 17 S. Ct. 72, 41 L. Ed. 467; Baugh v. United States (C. C. A. 9) 27 F.(2d) 257.

The court was requested to charge the jury that the appellants were not to be bound by the unauthorized statements or representations of their salesmen. In this particular the court instructed the jury that they must find the appellants engaged in the scheme with conscious knowledge of wrongdoing and with knowledge that misrepresentations as alleged in the indictment were being made. As far as the request constituted a proper statement of the law, it was substantially covered by the instruction as given. The appellants were not entitled to have the jury instructed in any particular form of words. McAdams v. United States (C. C. A. 8) 74 F.(2d) 37, filed Nov. 14, 1934; Busch v. United States (C. C. A. 8) 52 F.(2d) 79. The testimony of purchasers of the appellants' stocks and bonds concerning the representations made to them by salesmen established that they were in most instances similar in tone and were, to some extent at least, based upon the statements and information contained in pamphlets and circulars issued to the public and to the salesmen for their guidance, and were in substance the same representations as were made by the appellants themselves when they personally made sales. There was no failure to establish the conscious knowledge of the appellants of the alleged misrepresentations, and no error was committed in refusing the request.

It is further contended that the court erred in failing to withdraw from the jury the question of the issuance of false financial statements alleged to exaggerate the assets of the corporation and minimize its liabilities. The question involves a matter of accounting practice. The witness Ross, an accountant, testified that the financial statements correctly reflected the company's condition as shown by its books, and that the capital stock of the corporation was not a liability, and therefore was properly excluded in determining whether the assets were greater than the liabilities. On the other hand, an accountant for the government, Mr. Allen, made audits of the books of the company from its inception to and including the year 1931. He found that the company sustained losses in each of those years, and that the liabilities exceeded the assets from the very beginning. Greater elaboration upon the testimony of these witnesses would only serve to emphasize the controversial nature of the fact question presented. In its last analysis, it was properly a question of fact for the jury whether the financial statements falsely represented the condition of the company to the prospective purchasers of its stock and bonds.

The admission in evidence of certain photostatic copies of the original income tax returns of the Universal Bond & Mortgage Company and the Uni Bond Sales Corporation is assigned as error. The record discloses that they were properly certified in accordance with 28 USCA § 661. They were therefore equally admissible with the originals. Kurzrok v. United States (C. C. A. 8) 1 F.(2d) 209; Price v. State, 118 Tex. Cr. R. 82, 38 S.W.(2d) 811.

The appellants contend that they were denied a fair trial. They assert that certain statements and remarks of the court reflected upon the conduct of appellants' counsel and prejudiced them before the jury. The trial of this case was hotly contested. Sharp differences arose which led to much unnecessary colloquy between counsel and between court and counsel. There was some confusion occasioned by separate counsel for the respective defendants interposing objections, and orderly procedure was sometimes interfered with. On one such occasion the court remarked:

"This lawsuit is turning into a riot. I am not going ahead—both witnesses and lawyers—unless we can get better order in this court room, I am not going to proceed one more step, unless we can get order. This is the most outrageous case I ever tried. I have never seen all the lawyers try to talk at the same time while the witness is trying to talk. You will have to proceed in an orderly way. * * *

"The Court: No, I said the most outrageous trial of a lawsuit, and I repeat that. * * *

"No, not the case, but the most outrageous trial of a lawsuit. This morning has been a fair example of bad conduct in the court room, and I am not blaming anybody, but let's get away from that. You know how to try a lawsuit. Let's try it like lawyers."

An examination of the record indicates that the remarks complained of were not intended or calculated to create in the minds of the jurors any prejudice against the appellants. As between the parties, the court was eminently impartial. An appellate court should hesitate to reverse a case for the alleged misconduct of the trial court unless it appears that the remarks complained of tended to disparage the defendants before the jury and to prevent the jury from rendering an impartial judgment in the case. Goldstein v. United States (C. C. A. 8) 63 F.(2d) 609. The burden of showing prejudice rests upon the appellants, and they are not entitled to a reversal unless it is shown that they have been denied some substantial right, and thereby prevented from having a fair trial. Goldstein v. United States, supra; Hartzell v. United States (C. C. A. 8) 72 F.(2d) 569; Salerno v. United States (C. C. A. 8) 61 F.(2d) 419; Feigenbutz v. United States (C. C. A. 8) 65 F.(2d) 122; Miller v. United States (C. C. A. 8) 21 F.(2d) 32; Horning v. Dist. of Columbia, 254 U. S. 135, 41 S. Ct. 53, 65 L. Ed. 185; 28 USCA § 391. At the end of the morning session during which the colloquy complained of occurred, and again in its general charge at the end of the case, the court carefully and at length charged the jury that they were to disregard and dismiss from their minds all reference to remarks of the court and differences and controversies arising between counsel. A reading of the record satisfies that these admonitions of the court must have had the effect of dispelling any possible harmful effect the remarks may have had. Goldstein

v. United States, supra; Frantz v. United States (C. C. A. 6) 62 F.(2d) 737; Volkmor v. United States (C. C. A. 6) 13 F.(2d) 594.

On the cross-examination of Robert L. Cross, former sales agent and one of the original promoters of the Universal Bond & Mortgage Company, counsel for the appellants elicited from him the statement that he had been seeking to have the company placed in receivership for at least two years. On redirect examination he was permitted to explain, over objection, why he sought the receivership, and in this respect he testified as to his examination of the county records with reference to certain transactions. The testimony on cross-examination reveals that the witness was animated by a certain degree of hostility towards the defendants, which was not in any sense alleviated by the misconduct of appellants' attorneys toward him. They assert that it was error to permit the witness to explain why he sought to have a receiver appointed for the company, on the theory that, once a witness is shown on cross-examination to be prejudiced, he cannot thereafter be permitted to give reasons for, and attempt to justify, his bias. There are reasons appearing in the record itself which we believe preclude the assertion of error on any such theory of inadmissibility. To the question:

"Well now, just tell the jury why you went around," the objection was simply, "I object." Such a general objection does not call the court's attention to any specific grounds for the exclusion of such testimony. Hartzell v. United States (C. C. A. 8) 72 F.(2d) 569; United States v. Nickle (C. C. A. 8) 70 F.(2d) 873; Frates v. Eastman (C. C. A. 10) 57 F.(2d) 522; Frey & Son, Inc., v. Cudahy Packing Co., 256 U. S. 208, 41 S. Ct. 451, 65 L. Ed. 892; Kennedy Lumber Co. v. Rickborn (C. C. A. 4) 40 F.(2d) 228; Ottumwa Box Car Loader Co. v. Christy Box Car L. Co. (C. C. A. 8) 215 F. 362.

And again:

"The Court: The question is why he went around. He can say anything that moved him to go around. That would be competent.

"Mr. Burns: I am not objecting to that, but I do object to what he found in the county records."

At no place in the record is the court requested to exclude the testimony on the theory now asserted in the briefs. Hart-

zell v. United States (C. C. A. 8) 72 F.(2d) 569; Frates v. Eastman, supra; Paschen v. United States (C. C. A. 7) 70 F.(2d) 491; Arkansas Bridge Co. v. Kelly-Atkinson Const. Co. (C. C. A. 8) 282 F. 802; Lautz Co. v. Glenn (C. C.) 183 F. 666. On the contrary, no valid objection was interposed.

We have carefully examined the record, and are satisfied that the appellants were accorded a fair and impartial trial, and, no substantial error appearing, the judgment is affirmed.