## CARNAHAN v. UNITED STATES. *

Circuit Court of Appeals, Eighth Circuit.
September 16, 1929.

No. 8393.

*Rehearing denied November 22, 1929.

Walter W. Calvin, of Kansas City, Mo. (Frank P. Walsh and James P. Aylward, both of Kansas City, Mo., on the brief), for appellant.

William L. Vandeventer, U. S. Atty., of Kansas City, Mo.

Before STONE, BOOTH, and GARDNER, Circuit Judges.

STONE, Circuit Judge. Appellant, Carnahan, and others, were indicted for conspiracy to violate the National Prohibition Act (27 USCA). Carnahan and one De Mayo separately appealed. De Mayo has dismissed his appeal. This is the appeal of Carnahan. The claimed errors argued here involve the sufficiency of the indictment; the sufficiency of the evidence; the admission of evidence; the charge as given and refusal of requests to charge.

I. The indictment was in three counts. The government elected, at the beginning of the trial, to proceed on the first count. That count charged a conspiracy to violate the National Prohibition Act and set forth five overt acts.

Appellant attacks the indictment upon two grounds. A third matter is argued under the same heading of the brief. That matter is one of a claimed variance between the proof and the indictment. It has no bearing upon the sufficiency of the indictment except to throw light upon the result to which one of the contentions as to the indictment would lead.

The first and main attack upon the indictment is that it fails to allege that the conspiracy was formed to sell intoxicating liquor *for beverage purposes*. As to this matter the indictment charges as follows: That the accused and others "did unlawfully, knowingly, willfully and feloniously confederate, combine, conspire and agree * * * to continuously commit offenses

against the laws of the United States; * * * that is to say, that the said * * * did then and there unlawfully, willfully, knowingly and feloniously conspire, combine, confederate and agree * * * in violation of title II of the National Prohibition Act, and more particularly section 3 and section 29 thereof * * * engage in the business of unlawfully selling intoxicating liquors fit for beverage purposes, to wit, in the business of unlawfully selling whisky and alcohol, and * * * would * * * in violation of title II of the National Prohibition Act, and more particularly of sections 3 and 29 thereof, unlawfully sell to divers other persons * * * large quantities of whisky and alcohol suitable for beverage purposes, and containing more than one-half of one per cent. of alcohol by volume and * * * the said * * * made and caused to be made each and every one of the sales of whisky and alcohol hereinafter specifically described and charged in this indictment, and that each and every sale, and each and every act hereinafter charged was an overt act performed in pursuance of and to effect the purpose and object of the said unlawful conspiracy, combination, confederation and agreement between the several defendants herein named." This is followed by statement of five overt acts. The first overt act is a sale of 24 pints of whisky "suitable for beverage purposes and contained more than one-half of one per cent. of alcohol by volume in violation of title II of the National Prohibition Act, and more particularly of section 3 and section 29 thereof." Two other acts were for sales, and one other for agreement to sell, whisky or alcohol described as just above quoted. The fifth act was in setting up and maintaining an office where the conspirators "who were engaged in the unlawful manufacture, sale and transportation of intoxicating liquor * * * secreted, bargained and sold whisky and alcohol in violation of title II of the National Prohibition Act. * * * "

The argument is that the Eighteenth amendment was not directed at the manufacture, sale, transportation, importation, or exportation of all intoxicating liquors but at only such as were so dealt with *for beverage purposes.* "Congress is, therefore, limited in its power to legislate to certain specified acts which are committed for a *designated purpose;* that is to say, the manufacture and sale, etc., of intoxicating liquor, and that the power of Congress is further limited to the prohibition of the act proscribed only when the product or result of the proscribed act is to be used for stated purposes, to wit, for *beverage purposes.* In any prohibition or criminal legislation under this Amendment, two elements are ever present: (1) The proscribed act, and (2) the forbidden purpose. The power delegated to Congress to legislate on the subject cannot be broader than the plain intention and words of the Amendment." (Appellant's brief, p. 35.)

"We respectfully submit that the Act can be and should be, because of its own words, interpreted so as to be in perfect harmony with the Amendment. The Amendment is operative only to a limited extent, viz; *intoxicating liquors used for beverage purposes.* The Amendment does not govern or regulate the entire subject of 'intoxicating liquors,' and then by exception or proviso exclude from its operation intoxicating liquors intended to be used for *non-beverage purposes.* The scope of the Amendment is distinctly limited by its provisions, to wit, to 'intoxicating liquors for beverage purposes.'

"The same limited scope or operation is imposed upon the Act of Congress." (Appellant's brief, p. 36.)

The argument concludes that it is essential to aver that liquor dealt with in violation of the act is so dealt with "for beverage purposes."

We need not determine the scope of the amendment because it certainly goes to the extent argued and the statute goes no farther. The sole *purpose* of the act is to prevent the manufacture, sale, transportation, importation or exportation of intoxicating liquors *for beverage purposes.* To accomplish that *purpose,* Congress thought it necessary and deemed it wise to take complete control of all manufacture, sale, transportation, importation and exportation of intoxicants. United States v. Katz, 271 U. S. 354, 358, 46 S. Ct. 513, 70 L. Ed. 986. The second section of the amendment expressly empowers Congress to enforce the amendment "by appropriate legislation." Irrespective of this expression, the last paragraph of section 8, art. 1, of the Constitution gives Congress the power "to make all laws which shall be necessary and proper for carrying into execution * * * all other powers vested by this Constitution in the government of the United States. * * * " This certainly was within the grant of power by the amendment if such control is reasonably related to the power of controlling intoxicants for beverage purposes because a grant of power carries with it all reasonable means to render the exercise of that power effective. Lambert v. Yellowley, 272 U. S. 581, 47 S.

Ct. 210, 71 L. Ed. 422, 49 A. L. R. 575. There can be no doubt that any attempt to control intoxicants for beverages would be very ineffective were the manufacture, sale, etc., of intoxicants for other purposes left entirely free. One of the difficulties in the enforcement of this very act has been to prevent diversions of intoxicants from legitimate uses to that of beverages—even with the control and restrictions placed by the act upon legitimate usage. The title of the act is "An act to prohibit intoxicating beverages, and to regulate the manufacture, production, use, and sale of high proof spirits for other than beverage purposes, and to insure an ample supply of alcohol and promote its use in scientific research and in the development of fuel, dye, and other lawful industries." 41 Stat. 305. The act is divided into three titles with distinct, though related, subjects. Title 1 is entitled "To provide for the enforcement of war prohibition." We have no concern with that title as it was intended to meet a temporary situation and to cease when that situation vanished—that is, with complete demobilization of the World War troops. 41 Stat. 305. Title 2 is entitled "Prohibition of Intoxicating Beverages." Title 3 is entitled "Industrial Alcohol." The very heart of the entire act is contained in the first paragraph of section 3 of title 2, which is as follows:

"No person shall on or after the date when the eighteenth amendment to the constitution of the United States goes into effect, manufacture, sell, barter, transport, import, export, deliver, furnish or possess any intoxicating liquor except as authorized in this Act, and all the provisions of this Act shall be liberally construed to the end that the use of intoxicating liquor as a beverage may be prevented" 41 Stat. 308 (27 USCA § 12, par. 1).

A summary of all other provisions of the act (see Donnelley v. United States, 276 U. S. 505, 513, 48 S. Ct. 400, 72 L. Ed. 676) convinces that the entire purpose is to set forth in workable detail what has been generally announced in the above quotation from section 3. The plan of the act is to so control the production, handling and dealing in all intoxicants which are fit for beverage purposes or could be made so fit that use of such as beverages may be prevented. The rule announced by the act is that no intoxicating liquor fit for beverage can be manufactured, sold, etc. To this general and controlling rule, the statute specifies several carefully guarded exceptions. Obviously, these exceptions are in the nature of defensive negatives.

Of such nature is a defense that liquor "fit for beverage purposes" was sold for sacramental, scientific or industrial purposes by one having the right to so sell.

Section 32 of title 2 of the act expressly states that "it shall not be necessary in any * * * information, or indictment * * * to include any defensive negative averments, but it shall be sufficient to state that the act complained of was then and there prohibited and unlawful, but this provision shall not be construed to preclude the trial court from directing the furnishing the defendant a bill of particulars when it deems it proper to do so." 41 Stat. 317 (27 USCA § 49). This requirement is entirely valid. Besides, it is the general rule in federal criminal practice that negative defensive matters need not be alleged in the information or indictment. McKelvey v. United States, 260 U. S. 353, 357, 43 S. Ct. 132, 67 L. Ed. 301. Not only is this contention of appellant met by the above requirement of the act (section 32) and by the above rule of criminal practice, but, also, by decisions of this and other circuits directly in point, in this court the following: Jones v. United States, 18 F.(2d) 573; Myers v. United States, 15 F.(2d) 977; Keen v. United States, 11 F.(2d) 260, 263; Feinberg v. United States, 2 F.(2d) 955; Hensberg v. United States, 288 F. 370; Massey v. United States (C. C. A.) 281 F. 293, 295; in other circuits, the following: Gibson v. United States, 31 F. (2d) 19, 21 (C. C. A. 9); Belvin v. United States, 12 F.(2d) 548 (C. C. A. 4); McCarren v. United States, 8 F.(2d) 113 (C. C. A. 7); Ritter v. United States, 293 F. 187, 188 (C. C. A. 9); Rulovitch v. United States, 286 F. 315, 318 (C. C. A. 3), certiorari denied 261 U. S. 622, 43 S. Ct. 434, 67 L. Ed. 831; Cabiale v. United States, 276 F. 769 (C. C. A. 9); Davis v. United States, 274 F. 928 (C. C. A. 9); Hockett v. United States, 265 F. 588 (C. C. A. 9) certiorari denied; Wilson v. U. S., 254 U. S. 638, 41 S. Ct. 13, 65 L. Ed. 451. In the Fifth Circuit the rule is otherwise. Broadus v. United States, 30 F.(2d) 394; Middlebrooks v. United States, 23 F.(2d) 244; Brown v. United States, 21 F.(2d) 827. But see Lewis v. United States, 4 F.(2d) 520, 522, and Powers v. United States, 294 F. 512, 513, apparently opposed. The above applies to charges of conspiracy to violate the act. Gibson v. United States, 31 F.(2d) 19, 21 (C. C. A. 9); Belvin v. United States, 12 F.(2d) 548 (C. C. A. 4); Weinstein v. United States, 11 F. (2d) 505, 507 (C. C. A. 1); Williams v. United States, 3 F.(2d) 933 (C. C. A. 6);

Rulovitch v. United States, 286 F. 315 (C. C. A. 3). Therefore this contention of appellant is unsound.

█ The second matter argued as an attack upon the indictment is that the last overt act charged does not allege that the liquor was "to be used for beverage purposes." The charge as to this overt act was that the conspirators, "who were engaged in the unlawful manufacture, sale and transportation of intoxicating liquor," set up and maintained an office where they "secreted, bargained and sold whisky and alcohol in violation of title II of the National Prohibition Act. * * *" This sufficiently identified the crime charged as an overt act in pursuance of the alleged conspiracy to violate sections 3 and 29 of title 2 of the act (27 USCA §§ 12, 46). Vesely v. United States, 276 F. 693, 695 (C. C. A. 9). The same particularity in description of an overt act is not required as in description of a substantive offense. Obviously, if no allegation of use *for beverage purposes* is required in statement of a substantive offense violating the act (see above citations), there is no such requirement in stating an overt act under a charge for conspiracy to violate the act.

█ The matter of variance argued in connection with the sufficiency of the indictment is that there was no proof that the liquors sold were intended to be used for beverage purposes, but, on the contrary, the proof is that they were not to be so used, but were bought for the purpose of being used as evidence against the defendants. The evidence is that the alleged conspirators sold the liquors for beverage uses. If the sale was knowingly made in violation of the act—that is, was not bona fide within some one of the exceptions in the act permitting sale—the necessary intent existed. Obviously, the undisclosed intent of the purchaser is unimportant in judging the act of the seller. See James Robinson v. United States, this court, No. 7999, 32 F.(2d) 505, opinion on petition for rehearing filed April 15, 1929; Ritter v. United States, 293 F. 187, 189 (C. C. A. 9); Billingsley v. United States, 274 F. 86, 88 (C. C. A. 6).

II. Appellant attacks the sufficiency of the evidence. The first argument is that the purchase was not for beverage but for evidentiary purposes. This is answered by what has been said above on the contention as to variance.

█ The second argument is that the evidence failed to show guilt of this defendant. Neither defendant took the stand. The defense evidence was mainly confined to showing that the office of De Mayo (charged in the indictment as an overt act, to be the place "set up and maintained" by the alleged conspirators where liquor was "secreted, bargained and sold") was used by him in his capacity of president of the Sioux Oil Company. This "company" was a copartnership consisting of De Mayo, D. S. Howard and Elizabeth Mills. It was operating in Oklahoma. Howard had charge of the field work and he and Mrs. Mills (Howard's sister) lived there. The business transacted at the above office is thus described by Howard and by Mrs. Mills. By Howard: "This was the executive office. We would agree to drill a block of acreage and I took care of the field end of it and of course all business was transacted through this office, the bills were authorized and paid. Q. Were the pay rolls sent to this office? A. No; they were authorized and paid from that end but they were authorized from this office and the money was sent down from this office." By Mrs. Mills: "Q. What, if any business, did you do at the Kansas City office? A. Mr. De Mayo used to sell interests in our company and advise us whether to take certain acreage or not to take it or whether we would drill certain wells or whether he thought best that we did not drill them." Howard or Mrs. Mills would come to the office from once to four or five times a month. In the office was a map showing the acreage and pictures of the construction.

The evidence on the point of the connection of Carnahan with the conspiracy is as follows: Gust West, an informer, saw De Mayo in the above office on April 13, 1927, and approached him about selling alcohol to a friend of West. De Mayo then gave him the price. April 26 or 27, West took Kominakis to the office. While Kominakis was negotiating with De Mayo, Carnahan came into the room and asked of De Mayo, "Frank, where do you want me to take this car to these people" (referring to other persons)? De Mayo answered: "Drive slow down Forty-Second street toward Westport avenue and somebody will tell you." De Mayo sold and delivered to Kominakis a case of whisky that day. Carnahan had no knowledge nor immediate connection with this sale. Three days later (April 29), West and Kominakis went up to De Mayo's office, in the forenoon, and arranged to buy 50 gallons of grain alcohol. In the discussion of how it should be delivered, De Mayo suggested that they get a closed "Drive-Yourself" car and said: "Bring your car over here and give us the keys and we deliver the liquor. It won't take us long.

The stuff isn't very far from here, deliver it in 20 minutes, and if I am not here Bob will take care of you." That afternoon, the two hired a "Drive-Yourself" car, left it parked near the building where the office of De Mayo was and went up to the office. They found a stranger in the office. They inquired for De Mayo and, after finding he was not in asked "Is Bob in?" The man answered, "No, he is in the building; he will be in any moment." Later, Carnahan came in. West greeted him, "Hello, Bob," and he answered, "Hello, boys. Boys, where do you want me to deliver your stuff?" Kominakis suggested two places, to which Carnahan replied that each of them was "too dangerous." Finally, Carnahan said: "I deliver your stuff at Cherry, between Eighteenth and Nineteenth; it won't take me twenty minutes." West handed Carnahan the car keys and a slip of paper containing the car license number. Other inspectors, in car with a Colorado license, followed Carnahan in the car' to between Seventeenth and Eighteenth streets on Cherry, where Carnahan stopped, got out of his car and stood with one foot on the running board until they had passed him about 50 feet, when Carnahan got in his car and followed them for several blocks until they lost him in a traffic jam. West and Kominakis went, by other means, to the place on Cherry street, where they waited. Later, Carnahan drove up and told them, "I can't get in." After some conversation he said, "I try it again," and drove away. In about 15 minutes, De Mayo walked up to them and said: "Somebody·follow my man. My man call me up. You know they are smart boys; a man with a couple of ladies with a Colorado license follow my man; he call me up." After some further conversation, Carnahan drove up and De Mayo said: "Here is your stuff." As Carnahan walked away, West said, "Bob, you better give me the key," which Carnahan did and walked away. The car contained 50 one-gallon cans of alcohol. The cans were plain tin cans without label or inscription of any kind.

The argument for appellant is that there is no evidence that Carnahan knew what was in the cans, nor as to from whom or where the cans were obtained, nor that Carnahan conspired with De Mayo.

The above· outlined evidence leaves no doubt that Carnahan knew what the transaction was, what the cans contained and that he was cooperating with De Mayo in this violation of the law. The evidence is amply sufficient to prove his active participation in the conspiracy and in the particular overt act.

III. Appellant argues error in admission of three pieces of evidence.

The first is as to the admission of evidence concerning the transactions and conversations with De Mayo prior to April 29th. The basis of the objection is that such matters were prior to any showing, in the evidence, of a conspiracy between Carnahan and De Mayo. The testimony is that Carnahan appeared during the first conversation (April 26 or 27) between West, Kominakis and De Mayo. His colloquy with De Mayo at that time—in the light of his connection with the matters as shown by his conduct on April 29—leave no doubt of his connection with the conspiracy at the earlier date and clearly points to his connection prior thereto.

The second piece of evidence attacked is that of Ralph F. Stern. Stern was a lawyer in Chicago. He testified that after a former trial (mistrial) of this case, De Mayo came to his office and sought to get him to have the witness Kominakis leave the country. When this conversation was offered, counsel for defendants (De Mayo and Carnahan) objected "on the ground that it was at a time subsequent to the alleged offense mentioned. in the indictment and because it would be hearsay, mere hearsay and not binding upon the defendant Robert Carnahan." The court ruled: "Objection sustained as to the defendant Robert Carnahan and this testimony will not be considered as against him by the jury." To an inquiry as to whether the objection was overruled as to De Mayo, the court answered "Yes." At the close of the case for the government and out of the presence of the jury occurred the following:

"Mr. Aylward: The defendant De Mayo moves the court to strike out all the testimony of the witness Ralph Stern, because it is not tantamount to a confession of guilt, and is therefore inadmissible in this case, for the reason that at the first trial he entered formally in this court a plea of not guilty and the plea has stood ever since in all the cases upon which he is on trial. It is not admissible for all purposes because the issue to be determined by the jury is the guilt or innocence of this defendant and it cannot be foreclosed by any statement of guilt made to any witness after the commission of the alleged offense, out of court.

"The Court: That motion is overruled."

At the close of the case, there was offered and refused a request to charge as follows:

"The jury must not consider the evidence in this case relative to the conversation claimed to have taken place between the witnesses Stern and De Mayo, for the purpose of determining the guilt or innocence of the defendant Frank De Mayo, but they must decide that question without regard to said evidence and wholly on the other evidence in this case; and unless the jury believe beyond a reasonable doubt from the other evidence in this case, outside of and without regard to such conversation, that Frank De Mayo committed the offense charged in the indictment, then they must find the defendant not guilty."

In the course of the charge the court stated the offense charged was conspiracy, and if these two defendants did not conspire there could be no conviction as to either, and stated: "You cannot find one defendant guilty and the other defendant not guilty. Either they are both guilty or neither is guilty, because it is a charge of conspiracy between them and as I said to you before there cannot be a conspiracy unless at least two men participate in it. * * *" Later in the charge the court stated:

"Gentlemen of the jury, if you believe from the evidence in this case that a conspiracy was entered into between the defendants to violate the National Prohibition Act, in the particulars to which I have made reference, if you find that there was such a conspiracy from the evidence in the case, then, any statement made by any one of the persons involved in that conspiracy, even although not made in the presence of the other, provided that statement is made in furtherance of the conspiracy, may be considered as against the other. Let me make that more clear than perhaps I did make it as I stated it. If, disregarding any statements that have been made by any of the defendants, not in the presence of the other defendant, if, putting out of consideration that testimony from other facts in evidence it is shown that a conspiracy was formed by the defendants, then in that event a statement made by either of them, even although not in the presence of the other, in furtherance of the conspiracy, may be considered against the other during the life of the conspiracy as shown by the evidence in the case. On the other hand any statement which may have been made by one of the defendants after the conspiracy, and not in furtherance of the conspiracy, may not be considered as against the other defendant. In this case, for example, as I charged you during the progress of the case, the alleged conversation between Mr. De Mayo and Mr. Stern, the lawyer from Chicago, which took place after the first trial of this case as shown by the evidence, that statement cannot be considered by you as against the defendant Carnahan. It can be considered by you in connection with the case of the United States against Mr. De Mayo and in that connection only, and in this connection there is one thing which I want to say to you gentlemen, one other principle of law. Before an overt act is an overt act, before what is alleged to be an overt act is, within the meaning of the law, an overt act which can be considered by the jury, in determining the guilt or innocence of a man who is charged with this offense, the conspiracy must exist; the conspiracy must have been proved to have been in existence, before you have a right to consider anything as an overt act."

Thereafter, in summary of the testimony the court said: "Added to this testimony to which I have made reference is the testimony to which Mr. Stern gave testimony which as I have said is binding only against Mr. De Mayo and not upon Mr. Carnahan. * * *"

One of the grounds stated for exception to the charge was as follows:

"Because the charge of the court erroneously permits the jury to consider the testimony and statements of the witness Stern in this case and to be used against the defendant Carnahan although the court particularly charged the jury that it should not be so used, for the reason that the court had previously in its charge stated to the jury that they could not convict one defendant without convicting the other, so the admissibility of this particular testimony in this case, although limited to the defendant De Mayo alone is highly and grossly prejudicial to the defendant Carnahan and therefore destroys all of his defenses in this case and his right to have a fair and impartial trial, by a fair and impartial jury."

The argument here is that the evidence of Stern was "inadmissible for any purpose in this case against any of the defendants, and the limitation, which was an insufficient limitation, of its consideration by the jury as to De Mayo, alone, but for all purposes as to him was not in and of itself sufficient to cure the grievous error committed by the court as against Mr. Carnahan, jointly tried with De Mayo, "and he was condemned to suffer and be penalized with the same effect and to the same extent by a conviction for the act of De Mayo, with which he had no connection, and this testimony we believe alone was sufficient to have overshadowed all

4

other evidence and overbalanced any reasonable doubt in the minds of the jury as to Carnahan's innocence, and thereby deprived him of any trial of the real issue in the case and influenced the jury in finding him guilty jointly with De Mayo, regardless of what the other evidence tended to show as to his connection, if any, with the alleged offense." (Appellant's brief, p. 105.)

This was a conspiracy case. No effort was made to obtain separate trials, if such were allowable. The evidence of Stern was competent against De Mayo. The court, carefully and repeatedly, cautioned the jury as to the limitations of that testimony. There was no error in such admission thus carefully limited.

The third piece of evidence attacked is a statement made by De Mayo to West and Kominakis on Cherry street just before Carnahan drove up with the car loaded with alcohol. In connection with his suspicions because the car of Carnahan had been followed, De Mayo said:

" 'You are the first stranger I ever deal with;' he says, 'I been doing business here for a long time, government try to get me for the last five years, but they have not succeeded yet; I told my boy if the government wants to have me arrested they would have me arrested on the first delivery I make.' He says, 'If they would have arrested me look what the government will get in my possession,' and he pulled out of his pocket two checks and some money, one check was $10,000 and one was $15,000. I says to Mr. De Mayo, 'You must do good business.' He says, 'Yes, I make about $10,000 worth of business per month.' "

This was a statement by a conspirator concerning the subject of the conspiracy during the existence of the conspiracy. As such, it was competent against all of the then conspirators. Lane v. United States (this court) 34 F.(2d) 413.

IV. Several errors are urged in connection with the charge.

The first is that there was error in submission of the overt act relating to the office at Kansas City. It is argued that the court submitted an overt act not charged in the indictment nor supported by the proof.

The indictment charge as to this overt act is that, in pursuance of the conspiracy, defendants and others "did set up and maintain an office at 412 Kansas City Life Building * * * where the said * * *, who were engaged in the unlawful manufacture, sale and transportation of intoxicating liquor, * * * secreted, bargained and sold whisky and alcohol in violation of title II of the National Prohibition Act. * * * "

The proof was that the informers went to that office to find De Mayo for the purpose of buying liquor; that the negotiations for the sales were carried on and completed there although actual deliveries were made elsewhere in performance of such sales; that such arrangements covered the case of whisky bought on April 27th and the alcohol purchased on April 29th.

In describing the overt acts, in the charge, the court, as to this act, said: "Another of these was the alleged maintenance by the defendants of an office at 412 Kansas City Life Building where liquors were unlawfully to be sold."

The criticism is that the charge was of the maintenance of a place where sales were actually "consummated and completed" and not of a place "where liquors were unlawfully to be sold." The argument is that this charge permitted the jury to convict "if they had any intention to sell liquor in the future (a charge not included in the indictment), although before such intention became a reality or the contemplated time at which the intended sale was to be made they may have changed their minds and not have sold the same." This is hypercriticism. The language of the charge abundantly covered actual sales; the evidence showed actual sales; there was no evidence of any contemplated but uncompleted sales; the jury were told their verdict must be based upon the evidence. The language of the charge was within the indictment and the evidence.

Another contention is that the charge was misleading, inconsistent and confusing, was broader than the indictment, not supported thereby nor by the evidence and failed to submit all of the material and essential elements of the offense. One argument is that the court defined the offense as being a conspiracy to sell intoxicating liquor "for beverage purposes unlawfully" while the indictment stated only that the liquors were "fit for beverage purposes." This contention is answered by what is said above concerning a similar contention regarding the sufficiency of the indictment and by the authorities there cited. Also, it is said that another part of the charge was erroneous in describing the overt act of maintaining an office as a place "where liquors were unlawfully to be sold" and that this did not require that such liquors should be sold "for beverage purposes" and drew an unwarranted conclusion that liquors were unlawfully to

be sold when there was no allegation nor proof thereof. The court was merely summarizing the offense charged, the language was within the indictment and the assumption in the argument is unwarranted. Another criticism is that in a short quotation from the charge the court did not therein state that the liquor must be found to have been sold for beverage purposes. In other portions of the charge the court clearly and sufficiently covered this matter. The charge must, of course, be construed as a whole. There are two other contentions—one that the court charged that the conspiracy charged was to sell liquor "for beverage purposes" while the indictment stated only liquor "fit for beverage purposes"; the other is that the court, in another place, failed to allege that the liquor was sold for beverage purposes. The contradictory contentions have been answered by what has been said above.

Another contention is that the court, in the charge, assumed that defendants were guilty of previous violations of the law other than those charged in the indictment and drew unwarranted inferences from the evidence, thereby preventing a consideration of the issue of entrapment. The matter of entrapment was clearly and well stated by the court. In fact, upon the evidence here there is question whether there was any ground for the defense of entrapment.

Another contention is that a portion of the charge was a comment that certain evidence was corroborated and undisputed and, therefore, was a comment upon the failure of defendants to testify. The court made no comment whatsoever upon the evidence. It accurately outlined the evidence, piece by piece, and as to each cautioned the jury that it was for them to determine whether such conversations, negotiations and things took place. The court merely stated that certain witnesses had sworn to certain things.

Also, it is contended that the court erred in refusing to charge that there was no direct evidence of the commission of the crime. While some of the evidence was circumstantial, there was direct evidence and the court was right in refusing the request. Portman v. United States, 34 F.(2d) 406, this court; McMillan v. United States, 27 F.(2d) 94, this court.

In conclusion, it may be said that counsel have industriously and astutely combed this entire record for error. The case was carefully and correctly tried. All rights of the defendant were protected both by his counsel and by the court. There is no error.

The judgment should be and is affirmed.